**1ST OF AMERICA BANK, MID–MICHIGAN, N.A., Successor Conservator of the Estate of Michaela King, a minor; Lucinda E. King, individually; and Robert W. King, individually, Plaintiffs,**

v.

**The UNITED STATES of America, Defendant.**

No. 87–CV–74774–DT.

United States District Court, E.D. Michigan, S.D.

Dec. 6, 1990.

As Amended Dec. 10, 1990.

John W. Grigg, John W. Piggott, Seward, Tally & Piggott, P.C., Bay City, Mich., for plaintiffs.

James A. Brunson, Asst. U.S. Atty., Bay City, Mich., Lt. Col. Michael L. Fox, Claims & Tort Litigation Staff, Washington, D.C., for defendant.

## OPINION

GILMORE, District Judge.

This is a complicated medical malpractice case brought against the United States under the Federal Torts Claim Act, 28 U.S.C. 2671, et seq., (FTCA) alleging medical malpractice by physicians at the Wurtsmith Air Force Base, Oscoda Michigan, in the delivery and resuscitation of Michaela King on September 5, 1985.

In a trial lasting more than two weeks, 19 physicians testified for Plaintiff and Defendant.[1] For the reasons set forth herein, the Court determines that the Air Force physicians were guilty of malpractice, and that that malpractice was a proximate cause of the cerebral palsy, cortical blindness, and retardation of Michaela King.

## I

Lucinda E. King, wife of Airman First Class Robert W. King, consulted physicians at Wurtsmith Air Force Base in February of 1985 for prenatal care. An ultrasound at approximately 8 weeks indicated a due date of September 25, 1985. In the early weeks of the pregnancy, Mrs. King experienced some vaginal bleeding, which was stopped with bed rest. Testimony of all physicians who considered the bleeding was that it was not unusual and did not indicate a high risk pregnancy. Mrs. King had regular prenatal care, but missed a July appointment because she went to Eugene, Oregon, for a period of over a month to help care for her mother, who was recuperating from surgery. The pregnancy proceeded normally.

On September 4, 1985, Mrs. King had a spontaneous rupture of membranes—her

1. An abstract of the testimony of all physicians will be found in Appendix I to this opinion.

water broke. She was admitted to Wurtsmith Air Force Base Hospital at 12:30 p.m., and was instructed to walk the halls during the day, in an effort to naturally induce labor. She had occasional contractions, but did not go into labor. The fetus was intermittently monitored with an external fetal monitor, and Mrs. King stayed overnight at the hospital.

When labor had not begun by the following morning, labor was induced by use of the drug Pitocin, which causes uterine contractions. The drug was administered through an IV, and was periodically increased through the course of the labor. The induction began at 6:45 a.m. in a labor room. Mr. King was present throughout the labor and delivery. The contractions and fetal heart rate were monitored with an external fetal monitor. Testimony was conflicting about whether the monitor was working properly on this day, or whether it could properly monitor contractions in light of Mrs. King's strong reactions to contractions.

At 9:45 a.m., Dr. Philip Lawrence, who had completed his shift for that day at 8:00 a.m., but was temporarily covering for the other obstetrician on the floor, Dr. Brad Epstein, performed a vaginal examination on Mrs. King. She was 4–5 cm. dilated and 90% effaced. At that time, she was experiencing a great deal of pain in her labor, and Nurse Christy Kinnaird asked Mrs. King if she wanted a pain killer. She stated that she did, and Dr. Lawrence ordered 10 mg. of a narcotic pain killer, Nisentil. Nurse Kinnaird administered the drug through the IV. At 10:50 a.m. Dr. Lawrence approved and Nurse Kinnaird administered an additional 20 mg. of Nisentil subcutaneously. No physician examined Mrs. King before she was given the second dosage, but Dr. Epstein saw her at 11:05 a.m., and that examination revealed that she was dilated 6–7 centimeters.

By 11:20 a.m., Mrs. King was completely dilated and 100% effaced. She was experiencing uncontrollable urges to push. The fetal heart monitor was disconnected, and

she was rushed to the delivery room. Dr. Epstein performed a mid-line episiotomy. Mrs. King gave a mild push and delivered the baby's head. The doctor, based on his routine practice, suctioned the baby, and then rotated the baby and delivered the shoulders. He allowed Mr. King to pull the baby completely out. The child was a girl, named Michaela. Birth occurred at 11:31 a.m.

Dr. Epstein towelled off the baby and placed her on her mother's chest and abdomen. The baby did not cry or move. He then draped the baby with another towel and gently rubbed her. Nurse Kinnaird encouraged Mr. King to take a picture, and he took one or two. Dr. Epstein then clamped the umbilical cord and allowed Mr. King to cut it. Dr. Epstein then drew blood from the umbilical cord and Nurse Kinnaird walked away to prepare the baby's armbands.

At some point, Mr. King asked "Why is my baby so blue?" and was informed that all newborns are blue.

At one minute after birth, Airman VanAsdale, a delivery room technician, performed the one minute APGAR, which was 0. The APGAR is an evaluation of an infant in five categories: heart rate, respiration, muscle tone, reflex irritability and color.[2]

Airman VanAsdale found no heartbeat in Michaela. When so informed, Dr. Epstein carried her to the warming table and placed her head slanting down. While he prepared to put a bag and mask on the baby, Nurse Kinnaird and Airman VanAsdale began tactile stimulation. When that was ineffective in resuscitating her, Nurse Kinnaird ran to the phone and called for Dr. Roberto Caro, a pediatrician. She asked that he come immediately.

Dr. Epstein placed the oxygen mask on Michaela and established an airway and Nurse Kinnaird began chest compressions. They continued using the bag and mask for one or two minutes, but Michaela did not gain color or show signs of vitalization. A

---

**2.** Each category of the APGAR is scored on a scale of 0, 1, or 2. APGAR scoring is done every five minutes for up to 20 minutes, unless two successive scores are eight or greater.

five-minute APGAR indicated a score of one. Michaela's heart rate was 40 beats per minute, which is not sufficient to sustain circulatory perfusion. She had no other respiration, muscle tone or reflexes, and her color was still cyanotic.

Dr. Caro arrived in the delivery room and took over the resuscitation. He immediately placed an endotracheal tube through Michaela's mouth and into her trachea. It was stipulated that the tube was placed at 11:37, six minutes after Michaela's birth.[3] Only after intubation did Michaela begin to turn pink and show signs of life.

At 11:40 a.m., Dr. Caro administered Narcan, a substance used to neutralize the depressant effects of Nisentil on a fetus. Michaela's 10 minute APGAR, done at approximately 11:41 a.m., was 5. At 11:46 a.m., the endotracheal tube was removed, but no testing of Michaela's blood gases was done before the tube was taken out because the hospital's machine for testing blood arterial gases was broken down. Her level of acidosis, a condition of decreased ph or increased acidity in the blood, and hypercarbia, a condition of increased carbon dioxide in the blood, were not checked.[4] These, as well as asphyxia or hypoxia, a decrease of oxygen in the blood, can cause damage to brain cells. Michaela's blood pressure was never taken in the delivery room or later in the nursery. During the course of the resuscitation, Colonel Hartison, the hospital commander came to the delivery room and reassured Mr. King about what had just happened. Dr. Lawrence, the other obstetrician, also came into the delivery room.

After the baby's resuscitation, Dr. Epstein delivered Mrs. King's placenta and she was returned to the labor room. Mr. King accompanied Michaela to the nursery. Michaela was placed in an oxyhood with oxygen at 40%. Dr. Caro's initial examination of Michaela showed that she had a weak cry, had hypoactive (or decreased) muscle tone, was sluggish, had constricted pupils, had decreased reflexes and had a decreased Moro reflex. Her 15 minute APGAR was 8. Her head circumference was 32.5 cm. and her weight was 6 lbs. 12 oz. Dr. Caro ordered six hours of monitoring and was concerned about seizures developing in the first 24–48 hours as a result of the anoxic episode at birth.

During the course of the afternoon, a few alarms on the monitor went off when Michaela's breathing dropped below a certain level, but she spontaneously recovered from each of these episodes. Dr. Caro's check of Michaela at the end of the day demonstrated that she remained hypoactive and that her eyes were now slightly dilated. He was also concerned that the baby was not sucking or swallowing well and had trouble breast-feeding. He told the nursing staff to start an IV if Michaela did not feed better. Later that night, a nurse started the IV. Michaela did not cry when stuck with the needle. Thereafter, one of the nurses called Dr. Caro at home and described to him Michaela's facial grimaces and jerking movements, which were stilled when she was held. He determined these were not seizures and did not come in to check her.

Over the course of the next few days, Michaela remained floppy[5], and continued to have difficulty feeding. In the first 24 hours, her head size, or at least the measurement of her head size, showed an increase of one centimeter, to 33.5 cm. She developed a slightly jaundiced condition. She was able make urine and pass meconium. On September 9, 1985, after being kept in the hospital one additional day, Michaela was discharged. Her discharge

---

**3.** The Government contends that they stipulated only that the medical records reflected that the tube was placed at 11:37, and Government witnesses testified that the times in the medical record were a minute or more off. However, in the Joint Pretrial Statement, the Government explicitly agrees with the following: "Stipulated that Michaela King was not intubated until six minutes after delivery. (Dep. of Dr. Epstein, p. 191)." Clearly, the Government stipulated to the time of intubation. The reference to Dr. Epstein's deposition indicates only the source for this particular fact.

**4.** A glossary of medical terms is contained in Appendix II.

**5.** Physicians referred to Michaela's lack of muscle tone, or hypotonia, as floppy.

diagnosis, made by Dr. Adam Mezoff, Chief of Pediatrics at Wurtsmith Air Force Base Hospital, was "severe perinatal asphyxia," "abnormal neurological examinations secondary to above." The Kings were told to watch for seizure activity.

Michaela returned to the hospital on Sept. 11, 1985, because Dr. Caro had ordered a brain ultrasound, or echoencephalography to determine if Michaela's precipitous birth could have caused any hemorrhaging into the brain. Michaela was still floppy, but the results of the brain ultrasound were negative.

Over the next few months, Michaela attended regular well baby visits. Dr. Caro testified that she fell within the range of normal children on those visits.

However, on November 15, 1985, Michaela began to have noticeable seizures, which were growing more intense. Mr. and Mrs. King took Michaela to the hospital emergency room, and were instructed to take Michaela home, and to observe and count the episodes of seizures. When 13-15 episodes occurred within the next ten hours, her parents returned her to the hospital and she was admitted on November 16, 1985. Dr. Mezoff, who treated her at that time, wrote on her chart "possible seizures and neuroimpairment secondary to birth asphyxia." Dr. Mezoff also noted that an exam of her head, eyes, ears, nose and throat were remarkable for intermittent, continuing nystagmoid movements, which could reflect a neurological impairment. At that time, however, he determined that she had a good suck, swallow and grasp and that her cranial nerves were intact.

On November 18, 1985, Michaela was transferred to C.S. Mott Children's Hospital at the University of Michigan. Specialists there, including Dr. Faye Silverstein, examined Michaela and performed a series of tests. They conducted a CT scan and an electroencephalogram to try to determine the scope and cause of Michaela's problem. They also performed metabolic studies and other studies which would indicate the presence of infections or other problems during pregnancy. The test results were normal, showing no detectable metabolic disorder, normal amino acids, normal PKU, and normal galactosemia. The CT scan, however, showed changes consistent with mild cerebral atrophy. A TORCH screen, which detects congenital infections, was normal. At that time, Dr. Silverstein, a pediatric neurologist, opined the seizures to be "secondary to perinatal asphyxia." Michaela's seizures were controlled with phenobarbital, and she was discharged home on November 21, 1985.

She returned to Mott Children's Hospital on January 30, 1986, for follow-up by Dr. Silverstein, who was concerned that Michaela showed a lack of developmental progress. She was examined by a pediatric opthamologist and other opthamologists, who determined that Michaela had cortical blindness, that is, her eyes were normal, but she had a brain problem that caused blindness. The opthamologist's impression was that her blindness was caused by "perinatal asphyxia." Michaela had follow-up appointments at the University of Michigan Hospital, and Dr. Silverstein expressed continued concern regarding Michaela's ultimate neurologic outcome.

At age six months, Michaela's weight was below the fifth percentile, and she was having trouble eating and gaining weight, something Dr. Mezoff attributed to her neurological impairment.

In June 1986, the Kings moved to McCord Air Force Base, Tacoma, Washington, because of better facilities in the area for Michaela's treatment and because of closer proximity to family members. There, Michaela received medical care from physicians at the Madigan Army Medical Center. She was initially examined by Dr. Mark Nupen, Staff Pediatrician. Since then, she has also been seen by Major William McClintock, Pediatric Neurologist, Dr. Thomas Clingan, Developmental Pediatrician, and Dr. Mark Stephan, Pediatric Dysmorphologist.

Michaela King is now 5 years old. She suffers from cerebral palsy, cortical blindness, and retardation. In January, 1990, because she was not growing well, a gastrostomy tube was placed in her stomach, and she is fed a high caloric supplement

from it at night. She moves her extremities perpetually. She can slap switches to activate toys. She can say "mamma." She cannot walk, or talk meaningfully.. She is incontinent of urine and feces. All food that she takes by mouth must be prepared in a blender. She cannot feed herself. She cannot see.

Various tests disclose no genetic or metabolic bases for these problems. She has a younger sister and brother who are both normal. Michaela attends school for a half day each week day and receives some physical, speech and visual therapy at school. Therapy has disclosed that Michaela can track a light in a dark room. She currently receives additional speech and oral therapy twice a week in Tacoma, which is 18 miles from the King's home. In the past, her parents also took her to Tacoma for physical therapy and had visual and educational therapy at home. Her parents are her care providers, except for the time that she is in school.

Plaintiff filed suit against the United States on July 2, 1987, under the FTCA, alleging medical malpractice. The Complaint originally alleged medical malpractice on behalf of Michaela King (Count I), medical malpractice on behalf of Mrs. King (Count II), and loss of consortium, services, earnings, expenses, past present and future, on behalf of both parents. Judge Churchill, who was the judge on this case until trial, dismissed Count II for failure to exhaust administrative remedies, and dismissed the paragraph of Count III dealing with loss of consortium, pursuant to Michigan law. (Order dated March 3, 1989). Now before this Court is a medical malpractice action seeking medical expenses, loss of future earnings and wages, pain and suffering, and disability on behalf of Lucinda King, as Conservator for Michaela King, and past economic damages on behalf of the parents. Mr. and Mrs. King have stipulated that they are not entitled to other damages.

## II

Both parents testified at trial. Mrs. King related the facts of Michaela's birth and life with composure. She testified that during the course of her labor and delivery, the fetal heart monitor was not working properly and that hospital personnel occasionally pounded on the machine, and eventually exchanged it for another monitor.

After Michaela's delivery, Mrs. King went to the nursery to feed her. Michaela had difficulty nursing and sucking from a bottle. Even on the second day, Michaela would not nurse, and Mrs. King eventually fed her by cutting larger holes in a bottle nipple. She testified that Michaela had no head control, and she noticed sneer-like expressions on the baby's face. She was told to watch for seizure activity upon discharge, but when she asked the nurses what to watch for, they could not tell her.

At some point, Dr. Caro told her that Michaela's birth was different, because Michaela had suffered anoxia at birth, and similarly, at Madigan Medical Center, Dr. Nupen indicated that Michaela's problems resulted from anoxia at birth.

Mrs. King testified that at first the physicians generally tied Michaela's condition to anoxia at birth, but after the Kings started the instant lawsuit, they contended that they did not know the cause. They stopped referring to anoxia, and only referred to cerebral palsy. Drs. Clingan and McClintock, who saw Michaela at Madigan, both said at one time that Michaela had anoxia at birth and have now changed their positions.

She further testified that Michaela needs care 24 hours a day, and that the burden of that care falls on her and her husband. Champus, the health insurance provided to members of the military, has paid for most costs, though the Kings must pay a $25 deductible each month.

Mr. King credibly described Mrs. King's labor and delivery, and Michaela's birth. He stated that he does not plan a career in the Air Force, and that he is looking into private employment now. He has much concern about how Michaela's condition will affect his ability to get insurance coverage.

He also remembered problems with the monitor, and said that Airman VanAsdale had to adjust it and eventually replaced it, saying it was broken. He also described Michaela's condition in the nursery. He stated that she would not nurse or wake up. She was limp and floppy and hardly moved. He stated that the family now needs a van to transport Michaela but cannot afford one. He further stated that prior to the filing of this suit, the family hand-carried Michaela's medical records to doctor's appointments, but that after institution of this suit, her records were kept in the JAG office, and the family had to call the office to have records delivered to the doctor.

### III

The first question the Court must determine is whether the physicians who attended the labor and delivery of Michaela King fell below the standard of care required of reasonable obstetricians.

Under the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.* and 28 U.S.C. § 1346(b), this Court is required to apply the law of the State of Michigan. 28 U.S.C. § 1346(b) provides in pertinent part:

> Subject to the provisions of chapter 171 [28 U.S.C. § 2671 et seq.] of this title, the district courts ... shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages ... for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

The standard of care in a medical malpractice action is codified in Michigan Law. M.C.L.A. § 600.2912a provides in pertinent part:

> In an action alleging malpractice the plaintiff shall have the burden of proving that in light of the state of the art existing at the time of the alleged malpractice:

> . . . . .

> (b) The defendant, if a specialist, failed to provide the recognized standard of care within that specialty as reasonably applied in light of the facilities available in the community or other facilities reasonably available under the circumstances, and as a proximate result of the defendant failing to provide that standard, the plaintiff suffered an injury.

*See Jones v. Porretta*, 428 Mich. 132, 405 N.W.2d 863 (1987); *Sexton v. Petz*, 170 Mich.App. 561, 428 N.W.2d 715 (1988).

Plaintiff claims that the medical handling of the labor and delivery fell below the standard of care in two ways: first, physicians failed to properly monitor Mrs. King's Pitocin-induced labor, and thus were not aware that Mrs. King's uterus had become hyperirritated. It is claimed they failed to discontinue the Pitocin, and as a result, Michaela's birth was precipitous. Second, Michaela was born in a depressed condition, either as a result of the Nisentil administered to Mrs. King or as a result of the precipitous birth. Doctor Epstein failed to recognize her condition until the one minute APGAR. Though resuscitation was begun at that point, Michaela was not intubated until six minutes after her birth.

 The Court will begin with the allegations of improper monitoring of the Pitocin-induced labor. Dr. William Matview, one of Plaintiff's experts, testified that the tracing of uterine contractions indicated that Mrs. King's uterus had become hyperactive in response to the Pitocin dosage. He stated that, at that point, the Pitocin dosage should have been decreased or stopped, because it could cause a precipitous birth, in which the fetus cannot get enough oxygen because of decreased blood in the uterus or because of compression of the fetus' head in the birth canal.

It is undisputed that Michaela's birth was precipitous. Defendant's witnesses Dr. John McLaughlin, Dr. Philip Sunshine, Dr. Frank Miller, and Dr. Caro all stated

that it was precipitous. However, there is no evidence of any harm resulting from the precipitous birth. Dr. Matview admitted that an authoritative treatise stated that in some instances babies whose births are precipitous actually experience a protective effect and experience birth trauma for a shorter period of time. In addition, Dr. Miller testified that though a hyperirritated uterus could harm a fetus, damage would be indicated on the fetal monitor strip. With the exceptions of Drs. Matview and Menkes, it is generally conceded that the fetal monitor strip showed only occasional nonreassuring patterns which were resolved.

Similarly, harm from the battering effects of the baby's head against the birth canal, intensified in a precipitous birth, would be apparent in a newborn by bruises or hematoma or in the mother's vaginal tears. Michaela did not have bruising and Mrs. King did not have tears. The record is inconclusive regarding the hematoma, because a brain ultrasound was not performed until several days after Michaela's discharge, and testimony indicated that by that time, blood from a hematoma could easily have been absorbed.

In addition, the record does not indicate that Mrs. King's uterus was actually hyperactive. There is no question that she had a very painful labor, as she and Nurse Kinnaird both testified. It is undisputed that the tracings of her contractions are difficult to read. She suggests that the machine was not properly monitoring her. Nurse Kinnaird's testimony, consistent in both deposition and live testimony, is that Mrs. King was reacting strongly to the pain, and moving so much that the external monitor could not get a proper reading. Nurse Kinnaird stated that she was trying to palpate Mrs. King's contractions by hand, but even Dr. Miller, Defendant's witness, indicated that it is impossible to accurately monitor uterine contractions by hand.

The only evidence that Michaela was harmed by the clearly precipitous birth is

Dr. Matview's testimony. Even he admitted that precipitous births can actually protect a child. Because the evidence of hyperirritability is inconclusive, and because Michaela was born with no physical injury that might have resulted from a precipitous birth, the Court concludes that Plaintiff cannot meet the burden of proof on breach of the standard of care or on causation on this point.

■ The second question, whether there is liability as a result of Dr. Epstein's failure to promptly resuscitate Michaela, is a much more troubling question.

The Court will begin with the question of whether there was a breach of the standard of care. Colonel Fox, for Defendant, admitted in opening argument that Dr. Epstein delayed in intubating Michaela. He stated:

Now this is the difficult part, of course, for the government and that is we will have to admit at this point in time there was a delay in intubating the child and we do not pretend otherwise and will not take that stand. However, what we will admit to is not a complete failure on the part of the physician to intubate, that is, merely that the intubation should have occurred sooner, and the testimony will show that the surprise of Michaela King's condition at birth, not being expected or anticipated, justified the obstetrician's early response in attempting to stimulate the child and then resorting to bag and mask. Intubation should have occurred a couple of minutes sooner. That, of course, our own experts will testify to. Now concerning the intubation, there is clearly no causation in this case....

Similarly, almost every physician who considered this case, whether for Plaintiff or Defendant, including Dr. Epstein, stated that there was delay in intubation.[6] It is conceded that Dr. Epstein fell below the standard of care in not intubating Michaela more quickly.

6. Physicians stating there was a delay in intubation: Dr. Lawrence, Dr. Epstein, Dr. Caro, Dr. Menkes, Dr. Vallarta, Dr. Miller, Dr. Matview, Dr. Scher, Dr. Sunshine.

Based on the admissions of Defendant's attorney in his opening statement, on the testimony of the physicians mentioned, *supra*, and on the testimony of Dr. Epstein, it is clear that Dr. Epstein breached the standard of care of a reasonable obstetrician in not intubating Michaela much more quickly because of her 0 APGAR score and because of her lack of heartbeat at one minute. Thus, the first prong to establish liability—failure to adhere to the standard of care of a reasonable obstetrician—has been met. Consequently, the key question before this Court, and the issue on which the Government hangs its defense, is causation.

## IV

A discussion of causation must begin with a discussion of the witnesses. It is troublesome to the Court that many of Defendant's witnesses have not held a consistent position on the cause of Michaela's condition.[7] Most notably, Dr. Silverstein, when she treated Michaela in 1985 and 1986, clearly determined that the most likely cause of Michaela's condition was perinatal asphyxia. In contrast, she testified in Court that she now holds the position that, though she does not know the cause of Michaela's condition, the cause is not perinatal asphyxia. In between her change of position, she did not see Michaela.

In response to questions from the Court about why she had changed her position, Dr. Silverstein stated that in the profession generally, in response to litigation, there had been writing and discussion on diagnosing asphyxia in more limited circumstances, and that her thinking had evolved as a result of what she had read. The Court finds her testimony evasive, her attitude disdainful and arrogant, and the motivation for her change of opinion clearly suspect. The Court will disregard her changed opinion.

Other physicians also changed their positions subsequent to the filing of this lawsuit. Dr. Gary Mezoff, who discharged Michaela with a diagnosis of perinatal asphyxia, stated that he no longer believes the cause to be perinatal asphyxia because he has become aware of more entities that can cause problems in small children. Dr. Clingan, who treated Michaela at Madigan, first assessed Michaela as having "severe asphyxia at birth." At the time he gave his deposition, however, after reading material provided by Defendant, he stated that Michaela lacks classic symptoms of asphyxia, and it was too speculative to try and determine the cause of her condition.

Dr. William McClintock, who also saw Michaela at Madigan, diagnosed her in October 1986 as having severe brain injury, probably due to traumas at birth. In his deposition, however, he testified that perinatal asphyxia is not the cause of Michaela's problem, and her condition is due to something else.

Dr. Epstein at first testified that the cause of Michaela's condition could not have been lack of oxygen at birth, because it takes 10–12 minutes for people to suffer brain damage from lack of oxygen. However, in response to questioning from the Court, he stated that he knows of no other reason for Michaela's condition than perinatal asphyxia. Considering that Dr. Epstein thereby admitted responsibility for Michaela's condition, it was clearly a highly credible admission.

Of all the physicians whose position was not entirely consistent, the most reliable was Dr. Caro. Throughout Michaela's hospital course, he referred to her condition as depressed at birth. In courtroom testimony, he maintained that diagnosis. However, on Michaela's outpatient pediatric records, Dr. Caro had written "perinatal asphyxia." He testified that he did that because that was Dr. Mezoff's discharge diagnosis. Though the Court considers him a reliable witness, his use of the term "perinatal asphyxia" on the outpatient chart does suggest that he did not disagree with the diagnosis.

The Court looks with suspicion on the testimony of those witnesses who changed their position. Colonel Fox, defense attorney, had contacted many of them and pro-

---

7. Testimony of the physicians in this case is summarized in Appendix I.

vided them with information favorable to his case. In fact, as Dr. Silverstein testified, an article by Dr. Karen Nelson, provided to many of the doctors, and on which they relied in changing their opinions, was written in response to litigation.[8] It is the opinion of this Court that these doctors flip-flopped on causation because of this particular litigation and because of concern about litigation in general. Accordingly, it will disregard those discussions of causation.

Several other doctors also discussed causation. Dr. Nupen, who saw Michaela at Madigan, testified that perinatal asphyxia was his working diagnosis, and that Michaela's condition was consistent with that diagnosis. Dr. Menkes, a highly qualified expert, testified that the cause was perinatal asphyxia, as was indicated by Michaela's sickness as a newborn, her depressed APGAR, abnormalities on the fetal monitor strip, and her neurologic findings. The Court finds Dr. Menkes to be a measured, careful and reliable witness.

Dr. Matview also testified that Michaela's current condition is a result of perinatal asphyxia. The Court finds his testimony somewhat reaching. In addition, he lacked the academic credentials of many of the witnesses. His testimony does not weigh heavily in favor of Plaintiff.

Dr. Josefine Vallarta also clearly testified that, to a reasonable degree of medical certainty, Michaela's condition is a result of perinatal asphyxia. The Court finds her testimony objective and reliable. When Dr. Vallarta first examined Michaela, she could reach no conclusion about the cause of Michaela's condition. Therefore, she ordered a number of additional tests, including a chromosome analysis, a urine test to rule out metabolic causes, and dysmorphology testing to rule out genetic abnormalities. The results of these tests were normal. She then reviewed two CT scans, one done at Mott Children's Hospital and one done at Madigan, a hearing evaluation and Michaela's birth records. Only after this thorough review, which does not appear to be affected by a bias in favor of the Plaintiff, did Dr. Vallarta come to the firm conclusion that Michaela's brain dysfunction is due to perinatal asphyxia. In addition, Dr. Vallarta has examined Michaela a number of other times, and her opinion as to causation has not varied.

Dr. Miller was also a very credible witness. He, however, determined that to a reasonable degree of medical certainty, there was no causation between deprivation of oxygen at birth and current problems. The basis of his opinion was that there was insufficient time between delivery and establishment of an airway to cause brain damage. He, more than any other doctor, clearly established the depressant effects of Nisentil on a fetus. However, his opinion failed to account for the possibility that Michaela's heart could have stopped beating several minutes before her birth. He acknowledged that no one knows whether Michaela's heart was beating when she was born, but his testimony that there was insufficient time from delivery to resuscitation is undercut by the possibility that Michaela was born without respiration. Clearly, in that case, the delay in intubation was far more crucial.

Several other physicians, Drs. Scher, McLaughlin and Sunshine, testified that Michaela did not meet the criteria for a child who suffered brain damage as a result of perinatal asphyxia. The criteria for establishing perinatal asphyxia on which many of Defendant's witnesses relied, particularly Dr. Sunshine, came from an article by Dr. Karen Nelson. Defendant argues that the article is carved in stone and is the only proper measure of perinatal asphyxia. But, for all the discussion of the importance of that article, Defendant did not offer it into evidence, and the Court has not had an opportunity to review it. The Court is concerned that Defendant at no point made any effort to introduce it under Federal Rule of Evidence 803(18). It is true that under 803(18) the article itself

---

8. A discussion of this article, and this Court's concern with it, will be found *infra* p. 774 *et seq.*

could not have been received, but it could have been read into the record for the benefit of the Court, and the Court could have had an opportunity to judge its credibility, and whether the data upon which it was based were authoritative. To ask the Court to rely so heavily upon an article that allegedly was written in response to a litigation explosion, as suggested by Dr. Silverstein, is unwarranted.

Moreover, several witnesses, including Dr. Miller for Defendant, acknowledged that they had other definitions for perinatal asphyxia, and that according to some textbook definitions of the term, Michaela had suffered asphyxia.

According to testimony, the criteria of Dr. Nelson require that the following be satisfied before a diagnosis of perinatal asphyxia can be made:

1. Interpartum difficulty, including asphyxia

2. Other organ difficulties and a newborn course consistent with asphyxia

3. Other causes ruled out

4. All studies complete

The Court finds these criteria of questionable value in litigation. If a Court held a Plaintiff to these criteria before finding causation as a result of perinatal asphyxia, Plaintiff would be required to do more than demonstrate causation by a preponderance of the evidence. Plaintiff's proof would have to be essentially conclusive.

Nevertheless, because Defendant places so much emphasis on these criteria, the Court will evaluate the evidence in light of them. Dr. Menkes and Dr. Matview suggested that the fetal heart monitor showed some interpartum difficulty. During the critical interpartum period, after the second dose of a strong narcotic, there is no fetal heart tracing available. It is clear to this Court, as discussed more completely, *infra,* p. 777, that Michaela was born without respiration. Therefore, Michaela obviously suffered some asphyxia during the last 6–7 minutes of birth.

In assessing the second criterion, organ difficulty and a newborn course consistent with asphyxia, the Court points out that several critical tests were not performed. At the time the tube was removed, no blood gases or ph were checked. The test took seconds to do, but the machine was broken. Doctors Lawrence and Scher, who testified for the Defendant, indicated that failure to assess blood gases before removing the tube was a breach of the standard of care. Michaela's blood pressure was not taken during her newborn course, no organs were checked, and her urine output was not measured. In fact, a brain ultrasound was not done for several days after discharge.

The Government argues that without evidence of organ damage and other relevant measurements the Nelson criteria cannot be met. This Court is unwilling to let the Government benefit from its own doctors' failures to make relevant tests.

Moreover, other aspects of her newborn course were clearly consistent with perinatal asphyxia. The testimony is undisputed that she was hypoactive, or lacked tone, not only during her stay at the hospital, but on her return visit on September 11, 1985. As a newborn, she had difficulty sucking and swallowing. Mrs. King described Michaela's difficulty nursing.

Several physicians stated that Michaela had to show a much deeper depression to be suffering from perinatal asphyxia. However, the testimony indicates that Michaela was in a stuporous condition in the hospital. Her reflexes, most notably her Moro Reflex, which is key in demonstrating alertness, were depressed. She slept an inordinate amount of time. Mrs. King described how Michaela lay for hours in her hospital crib with her legs straight out at a 90 degree angle, never shifting to a more comfortable sleeping position. When an IV was started to compensate for Michaela's poor feeding, nurses reported that Michaela did not cry at the needle prick.

Physicians also indicated that Michaela's failure to develop seizures within the first 24–48 hours was inconsistent with perinatal asphyxia. However, Mrs. King described Michaela's unusual sneers in her first few days of life, and in the hospital Michaela was grimacing in a manner that caught the

attention of the nurse on duty and prompted her to call Dr. Caro at home. After hearing the nurse's description, Dr. Caro determined that there were no seizures. He did not see Michaela's behavior for himself. He at no point ordered an EEG, which witnesses recognized is the only method to verify whether or not seizures were occurring. Dr. Mezoff testified that Michaela's grimacing could have been seizures.

This Court is satisfied that any behavior unusual enough to prompt a call to Dr. Caro at home should have been followed up on. Once again, the Court is unwilling to let the Government benefit from its own doctor's failure to perform an EEG. The Court determines that seizures more probably than not occurred within the first 24 hours.

In regard to the requirements that studies be complete and all other causes be ruled out, the Court determines that any study relevant to Michaela's treatment has been performed. The tests show no genetic, metabolic or other basis for her abnormalities. To the extent compatible with a proper distribution of the burden of proof, these prongs are satisfied.

Because the Court finds the criteria on which Defendant's witnesses rely of questionable value and further finds them satisfied by Plaintiff to the extent appropriate, the Court will not rely on the testimony of those witnesses, particularly Dr. Sunshine, who stated, in reliance on the criteria, that there was no perinatal asphyxia.

A final discussion of credibility of witnesses on the question of causation concerns the neuroradiologists who reviewed Michaela's MRI. Three witnesses examined Michaela's MRI: Dr. Anthony Barkovich, who Judge Churchill requested perform the scan, Dr. Thomas Naidich, who is clearly an expert in neuroradiology of children, and Dr. Sharon Byrd, who is also clearly an expert in neuroradiology of children. Both Drs. Barkovich and Naidich determined that Michaela's MRI, to a reasonable degree of medical certainty, showed no evidence of asphyxic brain damage. Dr. Byrd concluded that children with asphyxic brain damage can have normal MRIs.

All agreed that the slight abnormalities of Michaela's MRI were non-specific. Dr. Barkovich testified that, if Michaela's impairment were due to asphyxia, he would expect to find severe brain damage, first to the watershed region of the brain, then to the thalami, basal ganglia, and hippocampus. Dr. Naidich testified that he has never seen a case of documented perinatal asphyxia with a normal MRI. He has seen cases deemed asphyxia, but not proven, with a normal MRI. He states that doctor's clinical judgment can be wrong up to 20% of the time. Consequently, he agrees with Dr. Byrd that clinical diagnosis of perinatal asphyxia might not appear on the MRI. He does, however, disagree with her conclusion that the normal MRI is not inconsistent with perinatal asphyxia, because there is no proof of perinatal asphyxia. He distinguishes between clinical judgment of perinatal asphyxia and proof of perinatal asphyxia. Dr. Byrd testified that children with extrapyramidal movement disorders, like Michaela's, could have normal MRIs and the basal ganglia could appear normal. She described to the Court, with the help of representative slides, the results of her study, in which 25% of children who had suffered asphyxia at birth and later developed cerebral palsy had normal MRIs.[9]

Of the three physicians, the Court finds the most relevant discussion to be that of Drs. Byrd and Naidich. Though Dr. Barkovich is clearly qualified, the Court is most concerned with the disagreement between

---

9. Contrary to the Defendant's assertion, the circumstances of Michaela's birth would have made her a proper subject to be included in Dr. Byrd's study. The labor and delivery history of the children involved is briefly set out in Appendix I to this opinion and Ex. 108 of the record. The page of Ex. 108 on which Defendant relied to suggest that Michaela did not fit Dr. Byrd's study did not set out who was included in the study, but rather described the children who were represented in the few slides Dr. Byrd showed the Court. From the page that briefly described the histories of the children involved in the study, it is clear that Michaela would have been a proper subject of the study.

Drs. Byrd and Naidich about whether a child with a diagnosis of asphyxia can have a normal MRI. Dr. Byrd has studied the question directly. Dr. Naidich addressed the question directly in his testimony. Neither disagrees that a child with a clinical diagnosis of perinatal asphyxia may have a normal MRI. Dr. Naidich asserts, however, that in documented cases of perinatal asphyxia, the MRI is never normal. Dr. Naidich then suggests that a clinical diagnosis of perinatal asphyxia could be wrong as much as 20% of the time. The nub of his testimony is that the Court should not rely on a clinical diagnosis of perinatal asphyxia. The problem with Dr. Naidich's testimony is that while he contrasts clinical diagnosis of perinatal asphyxia and documented cases, he does not indicate what constitutes a documented case. Moreover, the Court finds his suggestion that 20% of clinical diagnosis is wrong incredible. The number seems artfully chosen to discredit the 25% of cases in which Dr. Byrd found a normal MRI. The Court finds Dr. Byrd's testimony, therefore, reliable, and will accept her conclusion that a normal MRI is not inconsistent with perinatal asphyxia.

## V

The Court finds that Plaintiffs have met their burden of proof in demonstrating that failure to intubate Michaela promptly was a proximate cause of her current condition.

The standard of proof in this case, as it is in any civil case, is by a preponderance of the evidence. The Plaintiff has the responsibility to show that the facts it seeks to establish are more likely to be true than not. This means that Plaintiff must establish by a preponderance of the evidence that, to a reasonable medical certainty, the actions of the obstetrician before and at the time of Michaela's birth did not meet the standard of care, and that the failure to adhere to the standard of care was a proximate cause of the injuries to the child.

As discussed *supra*, Defendant has conceded that the failure to intubate Michaela within one minute of birth did not meet the standard of care, as have both Plaintiffs' and Defendant's physician witnesses. The basic issue, therefore, is whether the Plaintiffs have established by a preponderance of the evidence the necessary causation. And it was on this issue that the case was fought.

The Court feels the Plaintiffs have met their burden because every treating physician and every expert physician called by the Plaintiffs unequivocally stated that perinatal asphyxia was the cause of Michaela's difficulties. In addition, several of the physician witnesses stated that and later recanted. It is significant that the recantation took place after the institution of this action.

All that Defendant's witnesses could say, and all of those witnesses who recanted could say, was that they did not know what the cause of Michaela's condition was, but that it was not perinatal asphyxia. Extensive testing ruled out other possible causes, such as chromosomal causes and metabolic causes. It appears clear to the Court that in balancing, as it must, to determine whether the plaintiff has carried its burden of proof by a preponderance of the evidence, that the evidence of perinatal asphyxia being the cause of Michaela's problem far outweighs the testimony of Defendant's witnesses, who cannot state a cause. Moreover, for the reasons discussed *supra*, the Court finds Plaintiffs' witnesses more reliable than Defendant's, and for reasons discussed *infra*, finds Defendant's theories suggesting that other causes explain Michaela's condition or that Dr. Epstein's delay was justified completely unpersuasive. Therefore, it appears that Plaintiff has met its burden of proof by a preponderance of the evidence.

The Court recognizes that there was probably not enough time between delivery and intubation to cause the severe brain damage that Michaela has experienced. However, in any tort claim, a Defendant takes a Plaintiff as he finds her. Failure to intubate Michaela promptly occurred when Michaela was in a highly depressed condition. In the course of labor Mrs. King had been given two dosages of Nisentil in relatively close proximity, first through an IV and then subcutaneously.

Though witnesses on both sides generally agree that giving the Nisentil was not a breach of the standard of care, the physicians acknowledge that Nisentil has a respiratory depressant effect on adults. Dr. Miller's testimony was that Nisentil is passed through the placenta to a fetus, on whom it would have the same effect. When the second dose was given, no one foresaw that Mrs. King would deliver so soon thereafter. During the very rapid final stage of labor and the delivery, the Nisentil was at peak potence, as testimony clearly demonstrated. Its respiratory depressant effect cannot be ignored. More probably than not, it stopped Michaela's heart. At what point is uncertain, but the Court finds that her heart was stopped sometime before she was born.

Nurse Kinnaird testified that Michaela was born perfectly normal and that something happened in the first minute of her life to cause her heart to stop. However, this testimony is inconsistent with Dr. Epstein's, who described Michaela as cyanotic at birth and stated that he first knew something was wrong when he saw she was not gaining tone or breathing. His testimony, more consistent with all the facts surrounding her birth, indicates that Michaela was born without respiration.

In addition, Narcan, which Drs. Lawrence, Epstein and Mezoff testified should have been promptly administered to counteract the effects of Nisentil, was not given until 9 minutes after birth. Respiration having finally been started, the drug by then had very little effect.

One of Defendant's arguments is that Michaela's condition at birth can be treated as the basis for an inference that she had a metabolic or genetic problem. As Dr. Sunshine asserted, children with underlying genetic or metabolic problems do not tolerate the birth process well. However, the preponderance of testimony indicates that Michaela tolerated the birth process well. Defendant's witnesses testified without exception that Michaela's heart monitor strip did not show alarming patterns. Up to 6–7 minutes before her birth, Michaela was tolerating the process. It was only after the second dose of a potent narcotic, at its peak in the final stages of labor, that Michaela was unable to tolerate the birth process well. That provides no basis for an inference that she suffers a metabolic or genetic disorder.

Defendant also argues that Michaela's condition was a surprise, and that the staff could not have been expected to anticipate it. Surprise, they argue, is a basis for the delay. The Court rejects this argument for several reasons. First, considering the recent administration of Nisentil, there was reason to expect respiratory depression in Michaela. In addition, Dr. Epstein had the opportunity to closely observe Michaela as he suctioned her and to feel her tone and condition as he dried and draped her with towels. Therefore, before the one minute APGAR, he had the opportunity to determine her condition. As Dr. Lawrence testified, if a child is born cyanotic, lacks tone and does not cry, a doctor should be concerned and check the heartbeat before the one minute APGAR.

Finally, the delivery room was equipped for emergencies. Everything Dr. Epstein needed for emergencies, anticipated or otherwise, was available. He had been trained in the necessary procedures and knew intubation was appropriate, as is apparent in the fact that he had the equipment out when Dr. Caro arrived.

Standards read by Plaintiff's counsel and acknowledged by Dr. Epstein indicated that intubation should have been done immediately. Even Defendant's witnesses indicated that, at most, there should have been a two-minute delay in intubation. A two-minute delay could possibly be explained by surprise, but might well constitute malpractice; a five-minute delay, in a situation in which every second was vital, particularly in the later stages, cannot be explained or justified.

The Court finds that there was malpractice in not intubating Michaela within, at a maximum, one and a half minutes after birth. That would have allowed for detection of the problem, cardiac massage, and even 30 seconds of bag and mask. Moreover, the Court finds that there was mal-

practice in not administering Narcan promptly to counteract the effects of Nisentil.

Finally the Court concludes that this malpractice is a proximate cause of Michaela's current injuries. It is stipulated that Michaela was not intubated until 11:37, six minutes after her birth. The Court recognizes that six minutes alone could probably not cause brain damage. Defendant took Michaela as it found her. She was in a state of respiratory depression, her heart stopped from the effects of Nisentil, at the time she was born. She had been in that condition for an uncertain amount of time, but something between 6–11 minutes. Such lack of oxygen for 12–17 minutes could and, the preponderance of the evidence shows, did cause Michaela's injuries.

## VI

In determining damages, the Court must consider separately the damages of Lucinda E. King and Robert W. King individually, and the damages to Lucinda E. King, Conservator for Michaela King, a minor.

### A. *Damages of Lucinda E. King and Robert W. King*

The parents, Lucinda and Robert King, are entitled to only past economic and noneconomic damages. M.C.L.A. § 600.6305(1). The Plaintiffs stipulated at the time of trial that they were entitled to no future damages.

■ The parties agree that past economic damages total $346,918.00. However, the parties do not identify what is contained in that figure. The Court infers from Plaintiff's expert, Dr. Hoerneman, and from Ex. 103, that past home care alone constitutes the $346,918.00 figure. Defendant's expert, Dr. Eisenstadt, does not break down that amount, but Defendant argues that only $25.00/month is recoverable, because of Michigan's collateral source statute.

M.C.L.A. § 600.6303, relating to collateral source benefits, provides in pertinent part as follows:

(1) In a personal injury action in which the plaintiff seeks to recover for the expense of medical care, rehabilitation services, loss of earnings, loss of earning capacity, or other economic loss, evidence to establish that the expense or loss was paid or is payable, in whole or in part, by a collateral source shall be admissible to the court in which the action was brought after a verdict for the plaintiff, and before a judgment is entered on the verdict. Subject to subsection (5), if the court determines that all or part of the plaintiff's expense or loss has been paid or is payable by a collateral source, the court shall reduce that portion of the judgment which represents damages paid or payable by a collateral source....

. . . . .

(4) As used in this section, "collateral source" means benefits received or receivable from an insurance policy; benefits payable pursuant to a contract with a health care corporation.... Collateral source does not include life insurance benefits or benefits paid by a person ... entitled by law to a lien against the proceeds of a recovery by a plaintiff in a civil action for damages....

(5) For purposes of this section, benefits from a collateral source shall not be considered payable or receivable unless the court makes a determination that there is a previously existing contractual or statutory obligation on the part of the collateral source to pay the benefits.

It is clear that this Statute is applicable in this case because, under 10 U.S.C. §§ 1076 and 1077, the military is required to provide medical and dental care for dependents of members of the Armed Forces.

To the extent that the $346,918.00 figure includes medical and other expenses already compensated for by a collateral source, Plaintiffs' recovery of those damages is clearly precluded. Mr. and Mrs. King testified that all their medical expenses, except for a $25.00 per month deductible, were paid by Champus, the health care plan for the military. The military has paid for prescriptions, necessary equipment and even Michaela's diapers. The

few expenses not covered by Champus, such as the cost of Michaela's prosthetic shoes have been covered by other sources, such as the Crippled Children's Fund. None of these covered costs can be awarded in the Court's judgment because of the Michigan collateral source rule.

However, Plaintiffs have clearly paid a $25.00/month deductible. That is recoverable as a past economic damage. Up to the date of judgment, that figure would be $1,575.00.[10]

■ In addition, the parents have provided Michaela with attendant care. As Mrs. King testified, Michaela's care requires special training, and she stated that it was 24–hour care. Caring for Michaela was and is not the same as caring for a child without disabilities. She testified that the burden of that care falls on her and her husband. As discussed *infra*, this Court will be awarding future economic damages for attendant care. It follows that attendant care should also be recognized as a past damage. The Kings' testimony indicated that they did not attend to Michaela at all times; for example, they did not watch her in her sleep, though they checked on her at midnight and again at 6:00 a.m. The Court finds that their testimony establishes that they provided Michaela attendant care for, at a reasonable minimum, 15 hours a day. The Court further finds them entitled to compensation for their time. Testimony in regard to future attendant care suggested that $9.00 an hour was the appropriate figure for computation. In light of that, the Court determines that $8.00 an hour is a reasonable figure for Michaela's past attendant care. The Court awards Mr. and Mrs. King $219,000.00 for past attendant care.[11]

The Court will therefore award Mr. and Mrs. King a judgment in the amount of $220,575.00.

### B. *Damages for Lucinda King, Conservator for Michaela, a Minor*

The Court must now turn its attention to the proper damage award for Lucinda King, conservator for Michaela King, a minor. Here, the Court will first consider future damages. These include medical and other costs of health care, lost wages or earning capacity and noneconomic loss.

■ The first step the Court must take in addressing future damages is determining Michaela's life expectancy. There was a great deal of evidence regarding Michaela's life expectancy. Defendant made reference to a study by Eryman indicating that incontinent, retarded, immobile individuals can be expected to have a life expectancy of only five years.[12] The Court does not find this study applicable to Michaela. First, Michaela is not immobile; she has the capacity to scoot. Second, the extent of her retardation is not determinable. Determinations introduced by Mr. Curtis, an annuitist, suggested that Michaela could live longer than 50 years. The Court is convinced that more probably than not Michaela will live longer than 5 years, but not as long as 50 years. Testimony was clear that children in her condition are more prone to sickness and disease. Testimony was also clear that children who get good care from loving family members, like Michaela does, are likely to live longer. In light of all the evidence on life expectancy, the Court determines that 30 years is a reasonable life expectancy for Michaela.

The first category to consider is Michaela's medical and other costs of health care. Though all of Michaela's medical costs have been paid by Champus, there is no indication that future costs will be paid by Champus. Mr. King clearly testified that he would like to leave the military for civilian employment. The Court will not assume that Mr. King will stay in the military. In addition, Michaela's condition is such that no private insurance carrier is likely to pick her up. The Court will treat

---

**10.** $25.00/hour $\times$ ((5 years $\times$ 12 months) + 3 months) (Oct., Nov. and Dec. 1990) = $1,575.00

**11.** ((15 hours a day $\times$ 365 days a year) $\times$ 5 years) $\times$ $8.00/hour = $219,000.00

**12.** Like the Nelson study, this study was not read into the record.

all proven future medical and health care costs as future damages.

Plaintiff presented the proof of several witnesses to support its future medical damage claims. Mrs. King, Ms. Englehardt, Dr. Marriner and Ms. Nelson testified regarding Michaela's therapy, attendant care, equipment and communication needs. Dr. Vallarta reinforced all their testimony, and described her own view of Michaela's medical and health needs. In response, Defendant presented the testimony of Dr. McLaughlin, who basically contended that Michaela's therapy needs were adequately met by the public schools. However, Dr. McLaughlin had not visited Michaela's school and could not testify about the specific facilities at Custer School, where Michaela attends.

On items other than attendant care, therapy and augmentative communication, there was little to no difference between Plaintiff and Defendant. It is the opinion of this Court that Plaintiff has met her burden of proof in establishing the future medical and health care damages she claims. For a 30 year life expectancy, those damages total $7,198,863.12. When reduced to present value using a 5% simple interest calculation, those damages total $2,284,928.00.[13] A breakdown of the damages by year, as required by M.C.L.A. § 600.6305(1)(b) is contained in Appendix III.

Plaintiff's expert, Dr. Hoerneman argued that inflation should be factored in at a compounded rate, and the reduction to present value should be done by a simple rate. It is apparent to the Court that this contention is unsupported by the statute, which does not provide for inflation, and is an attempt to inflate damages unfairly. The Court rejects Dr. Hoerneman's analysis. The Michigan 5% method, as Defendant's expert, Dr. Eisenstadt, effectively demonstrated parallels real world economic models and results in amounts similar to what would be paid on annuities by reputable financial companies. The Court's damage award follows the Michigan 5% method as outlined by Dr. Eisenstadt.

The next category is loss of earnings and earning potential. Both economic experts relied on the same figures to determine lost earnings. But, for the reasons discussed above, the Court finds Plaintiff's final figure unreliably inflated. It therefore adopts Defendant's figure for lost earnings and earning capacity, awarding Michaela $223,976.00 for lost earnings and earning capacity. That figure is reduced to present value. A breakdown of the damages by year, as required by M.C.L.A. § 600.6305(1)(b) is contained in Appendix III.

■ Finally, the Court must determine the amount of noneconomic damages. Non-economic damages in this case are based on Michaela's disability, disfigurement and pain and suffering. The video demonstrating her great physical limitations underscore the extent of her disability. There was a great deal of testimony regarding her limited capacities for meaningful movement, for communication, and for normal human progress. She will spend her life in special schools, in various kinds of therapy, and will require special equipment for ordinary tasks such as eating and communicating. There is no question that she has a compensable disability. Her disfigurement is minimal, but she does suffer some. Her eyes do not focus and she requires special shoes. She is in a state of constant motion. Finally, it is difficult to assess her pain and suffering. She will not live a life like her sister and brother. But Dr. Menkes testified that it is difficult to estimate her intelligence. It is unclear whether she will be aware of the differences. Fortunately, Dr. Vallarta testified that Michaela is a happy child. Her mother described smiles, and the Court observed her smiles and the good care she receives in the video presented as Ex. 90.

The Plaintiff seeks $2,000,000.00 in noneconomic damages, past and future. The Court finds that this is a reasonable figure established by a preponderance of the evidence for Michaela's noneconomic injury, particular her disability.

---

13. *See* M.C.L.A. § 600.6306(2).

Of that amount, 5 years worth, or one-seventh, is for past damage. Therefore, for past noneconomic damages, Michaela's estate will receive $285,714.00. This leaves future damages of $1,714,286.00, which, when reduced to present value over 30 years, amounts to $1,030,246.60. A breakdown of the damages by year, as required by M.C.L.A. § 600.6305(1)(b) is contained in Appendix III. Therefore, a judgment will be entered for Lucinda King, as conservator of Michaela King, in the amount of $1,315,960.60 for past and present non-economic loss.

The total judgment against the Defendants on behalf of Lucinda King as conservator of Michaela King is $3,824,864.60. This figure is made up of future medical and health care costs reduced to present value of $2,284,928.00, future loss of earnings, reduced to present value, of $223,976.00, past noneconomic damage of $285,714.00, and future economic damage, reduced to present value, of $1,030,245.60.

Judgment will be entered in that amount for Lucinda King, as conservator of Michaela King.

## CONCLUSION

Based on all of the above, the Court finds that Defendant committed malpractice and that the malpractice was a proximate cause of the harm Plaintiff now suffers. The parents are awarded past economic damages in the amount of $220,500.00, and Lucinda King, as conservator of Michaela King, is awarded $3,824,864.60. An appropriate judgment will be entered.

## APPENDIX I

A. *Physicians who treated or cared for Michaela for purposes other than giving an opinion in this lawsuit*

1. Dr. Phillip Lawrence

Dr. Lawrence's testimony was presented by deposition. Dr. Lawrence was the first obstetrician who cared for Mrs. King. He cared for her after a miscarriage in a previous pregnancy, and treated her for spotting early in the pregnancy with Michaela. He found Mrs. King had no uterine abnormalities and that her cultures and tests were normal in pregnancy, with no indication of infection. He began her induction at 6:45 a.m. on Sept. 5, 1985. He testified that doctors at Wurtsmith AFB used internal monitors during delivery only when there was an indication of special need, which there was not in this case. Similarly, he testified that, if a baby is doing well at birth, it is appropriate to put the child on the mother's abdomen and to let the mother hold the child for an extended period. He found no evidence of hypertonicity or hyperirritability on the strip. He stated that the transitional phase of this birth was unusually rapid, especially for a first delivery. He stated that the effects of Nisentil could have caused the baby's respiratory depression, since she delivered sooner than was expected. He stated that Narcan is given to counteract the effects of Nisentil, and history in this case indicated that it should have been given promptly. He testified that ventilation with an endotracheal tube is often better than with a bag and mask, and he does not know why Michaela was not intubated by the time he arrived in the delivery room. He believes there was some delay in intubation. He stated that the APGAR scores of 1 at 5 and 5 at 10 indicate that Michaela was severely depressed, probably hypoxic. Children in that condition often have acidosis, making ph assessment and treatment desireable. He further testified that when a doctor wipes off and handles a baby, he or she knows something about muscle tone. If the child is cyanotic, or lacks tone, and does not cry, then the doctor should be concerned and should check the heartbeat before the 1 minute APGAR.

2. Dr. Brad Epstein

Doctor Epstein testified live. He was the obstetrician who delivered Michaela. His testimony was very important. He testified at birth that the baby looked cyanotic, or blue, but was within the range of normal. At some point after he placed Michaela on Mrs. King's stomach, he realized Michaela was not getting good tone or getting an expansion breath. He explained

that according to his training, he should put a bag and mask on the baby first to get expansion going, and that that will improve most hypoxic infants. He acknowledged, however, that the neonatal standard of care applicable to him required him to intubate the baby immediately upon realizing that her heartbeat was not above 60–80 beats per minute. He believes today that he should have intubated sooner, but he does not think that would have made a difference in Michaela's outcome, because it takes 10–12 minutes for lack of oxygen to cause permanent brain damage. Nevertheless, under questioning by the Court, Dr. Epstein stated that he knows of no reason for Michaela's condition other than perinatal asphyxia. He said that the connection between asphyxia and her condition are only temporal and not scientific. Science does not know the cause of her illness. He further testified that Nisentil acts as a respiratory depressant, and the dosage given at 10:50 would have been at peak strength at the time of birth. Narcan, which neutralized the effects of Nisentil, was not given until 9 minutes after birth. He testified also that the fetal heart monitors at Wurtsmith broke down intermittently, but when they were broken they did not record at all. They were fixed promptly. Dr. Epstein admitted that he breached the standard of care in not promptly intubating Michaela. Moreover, by not administering Narcan to counteract the respiratory depressant effects of Nisentil, he further contributed to Michaela's prolonged respiratory depression.

### 3. Dr. Roberto Caro

Dr. Caro testified live. He was the pediatrician who rushed to the delivery room and immediately intubated Michaela. He also administered Narcan when he learned that Mrs. King had been given Nisentil. He testified that Michaela responded well to intubation; she pinked up and gave a weak cry. He took the tube out six minutes after placing it. He did not first check her blood arterial gases because the machine was not working and the baby responded so well to intubation. He stat-

ed, however, that even a child who looks good can suffer acidosis. Because she showed no signs of blood perfusion, he did not take her blood pressure. He stated that Michaela's precipitous birth might possibly have caused some depression or failure to breathe. Dr. Caro stated that during the hospital course, he diagnosed Michaela's condition as depressed. However, Dr. Caro admits that he wrote "perinatal asphyxia" on Michaela's outpatient pediatric records, which he states he merely transferred over from Dr. Mezoff's discharge diagnosis. Dr. Caro testified that it takes 10–12 minutes of oxygen deprivation before humans suffer brain damage, though the time period may be longer for a newborn. Six minutes of oxygen deprivation is not enough for perinatal asphyxia. He does not think Michaela fits the pattern for perinatal asphyxia. He stated that the discharge diagnosis of perinatal asphyxia was standard with APGAR scores of 0 at 1 minute and 1 at 5 minutes.

### 4. Dr. Gary Mezoff

Dr. Mezoff's testimony was presented by deposition. He was the chief of pediatrics at Wurtsmith at the time of Michaela's birth and was the discharging pediatrician. He also examined Michaela in November 1986, when she came to the emergency room because of seizures and saw her thereafter. He testified that it is in keeping with the standard of care to test blood arterial gases when there are clinical findings of severe hypoxia. He thinks that Michaela had findings of hypoxia. He discussed Michaela with Dr. Caro the day before her discharge, because she was eating poorly and had had low APGARs. It was necessary to watch her for neurologic findings indicating a problem. He wrote on her discharge record that Michaela had neurological abnormalities secondary to severe perinatal asphyxia. On the back of the medical form, he noted a number of factors consistent with a neurologic impairment, including poor rooting and sucking, poor Moro (startle) and other reflexes, hypotonicity, which he considered to be secondary to asphyxia. He indicated, however, that he has since become aware of

more entities that can cause problems in small children, and no longer believes that perinatal asphyxia was the cause of Michaela's disorders. He also testified that he considered Michaela's depression from hypoxia to have been caused by the Nisentil, and it would have been in keeping with good standards of medical care to give Narcan to counteract the effects of Nisentil as soon as possible. Finally, he indicated that the grimacing noted by the nurse on the first night of Michaela's life might have been seizures.

### 5. Dr. Faye Silverstein

Dr. Silverstein testified live. She is a pediatric neurologist. She was the attending physician who saw Michaela when she was referred to Mott Children's Hospital at the University of Michigan in November 1985. Dr. Silverstein saw Michaela at least twice thereafter. Dr. Silverstein was a witness whom Defendant's attorney described as someone "who did not want to be here." Her demeanor and responses were belligerent, her attitude disdainful and arrogant. Dr. Silverstein stated that when she saw Michaela in 1985, her opinion as to cause was that it was most likely due to perinatal asphyxia. However, by the time she was asked to testify, originally by deposition and then in court, she no longer accepted the cause as perinatal asphyxia. She had not seen Michaela in the interval of time in which her opinion changed. She stated that because Michaela showed no organ damage, because she did not show signs of clear cut encephalopathy, and because she had had a normal MRI, that there were not enough positive indications to call Michaela's problem at birth asphyxia. She stated vaguely that between 1986–1988, based on an article by Karen Nelson and on other reading she had done, her thinking on perinatal asphyxia had evolved. Dr. Silverstein finally stated that the medical thinking on this topic had evolved as a result of litigation. The Court finds that Dr. Silverstein's opinion, likewise, evolved as a result of the instant litigation, and possibly other litigation. She could not otherwise explain her flip-flop on causation.

### 6. Dr. Mark Nupen

Dr. Nupen's testimony was presented by deposition. He is a pediatrician who has regularly seen Michaela since the family moved to Washington. He first saw Michaela on June 10, 1986 for coughs and seizures. He testified that he knew within the first visit or so that the Kings were planning a lawsuit, but that that never affected his judgment. He testified that Michaela has a seizure disorder and developmental delay consistent with a child who had been asphyxiated, and asphyxiation was his working diagnosis, and was based on his consultations with Dr. McClintock (testimony *infra*).

### 7. Dr. Thomas Clingan

Dr. Clingan's testimony was presented by deposition. He is a developmental pediatrician who examines and manages children with developmental problems. He helped Dr. Nupen determine what interventions were appropriate for Michaela and made initial referrals. He then followed up occasionally. In preparation for his testimony in this case, he reviewed Michaela's medical records, Dr. Volpe's textbook on neonatal neurology, and several articles on the relationship between neonatal asphyxia and cerebral palsy. The literature indicated that a very small percentage of children with cerebral palsy had asphyxia at birth. His diagnosis, recorded 7/14/86 was that Michaela had severe developmental delays, probable cortical blindness, hypotonia and seizure disorder. He did not at that time determine the cause. He states that it is not clear to him that Michaela's condition is a result of interpartum asphyxia, because the medical history is not classic for neonatal ischemic encephalopathy. Particularly, she was not comatose, she did not have devastated neurological processes, she did not have seizures within the first three days, and she was discharged at 4 days with only mild abnormalities. It is speculative to try and make a cause and effect determination. He testified that it would have been valuable if blood arterial gases had been tested, because untreated acidosis can have adverse effects on multi-

ple organ systems. He determined that there were no adverse effects on the pregnancy from spotting in the early months or from the induction with Pitocin. He determined that he could not rule encephalopathy from asphyxia either in or out based on his information. He cannot state a cause of the cerebral palsy in most of the children he follows. He did note in his first assessment of Michaela a history of "severe asphyxia at birth." He states that he should have been more precise in his use of the term. He used those terms because the neurologist who originally saw her had used that term. He further states that the term perinatal asphyxia or asphyxia was used rather liberally and loosely prior to litigation. He cannot say to a reasonable degree of medical certainty that causes such as infections, drugs, metabolic or chemical abnormalities, or radiation are ruled out. He does admit that asphyxia is a cause of extrapyramidal cerebral palsy and that perinatal asphyxia can be caused by obstetrical negligence.

### 8. Dr. Mark Stephan

Dr. Stephan's testimony was presented by deposition. He is a pediatrician and dysmorphologist. He evaded many questions by stating that he lacked expertise in one area or another, and the Court finds him an uncooperative and evasive witness, and will discount his opinion accordingly. He first saw Michaela on June 3, 1987, at Dr. Nupen's request. At that time, the Kings told him that they were involved in litigation. He diagnoses Michaela's condition as static encephalopathy, but cannot rule out other causes. Although her chromosomal analysis is normal, the test does not rule out chromosomal abnormalities. There are no significant abnormalities on the MRI or CT scan, which one would expect to see in a case of hypoxic damage. Michaela's APGAR scores are such that they indicate that she needed to be watched, but they are not strongly predictive of an adverse neurologic outcome. He agrees there was asphyxia at birth only if the term is limited to meaning that the child needed resuscitation. She does not meet the criteria for determining that interpartum asphyxia is an etiology of cerebral palsy, which are acidosis with a base level of 25, damage to other organs, stormy newborn neurologic course, seizures within first 72 hours. He can't make a diagnosis of a known, recognized syndrome. He does think it is totally unlikely that Michaela suffered from an inborn error of metabolism that caused apnea at birth. He could not tell the Kings 100% that they do not each carry a recessive gene that is responsible for their daughter's condition, although he considers it unlikely. However, he said that more probably than not, Michaela's condition is not a result of chromosomal or genetic defect. There is a slight possibility that further testing might shed light on the etiology of Michaela's condition, but that would only be done for the purposes of litigation and not for treatment.

### 9. Dr. William McClintock

Dr. McClintock's testimony was presented by deposition. He is a major in the U.S. Army and a child neurologist. He is Chief of Pediatrics in Neurology at Madigan. He first saw Michaela on June 17, 1986, at which time he determined that she was neurologically impaired. In October, 1986, on a medical statement, he stated that Michaela had "severe brain injury, presumably due to birth traumas." In analyzing Michaela, he did a number of tests, including a urine metabolic screen, a TORCH screen, a CT scan, an EEG and a chromosome screen. All but the EEG were normal, though the CT scan showed some slightly generous ventricles. Some children with brain dysfunction have enlarged ventricles, but normal kids might have ventricles larger than hers. The EEG showed excessive fast activity, which is usually secondary to phenobarbital, and a lack of sleep element, which is compatible with brain disfunction. He agrees that she was hypoxic at birth and probably had mild acidosis. Though he stated he was not familiar with her history at birth, including the fact that she was not breathing when delivered and had no heartbeat, he thinks at this time that, more probably than not, she did not

suffer the syndrome of perinatal asphyxia, and her disabilities are due to something else. The most likely cause is a problem with cerebral development of her brain, but the state of the art in medicine does not diagnose the cause of cerebral palsy in many children. His diagnosis is static encephalopathy with severe developmental delay, low tone from brain disease and cortical blindness. He does not think Michaela suffered from the clinical syndrome of hypoxic ischemic injury, and he would now state that her condition is of unknown etiology, rather than what he stated in October 1986. His change of opinion, he states, is not influenced by litigation. He is another of several treating physicians who have changed their positions without adequately explaining why.

*B.* *Physicians who examined Michaela or reviewed her medical records for the purpose of giving an opinion in this lawsuit*

1. Dr. John Menkes

Dr. Menkes testified live. He is a pediatric neurologist, who does not currently resuscitate children. He examined Michaela and reviewed her records and immediately prepared a report. He concluded that Michaela's brain damage was due to lack of oxygen during the period of birth and immediately thereafter. His conclusions were based on the following: 1) Michaela was sick after birth; 2) Michaela had a depressed APGAR at birth; 3) her neurologic findings, including extrapyramidal cerebral palsy, are consistent with perinatal asphyxia; 4) her fetal monitor strip showed abnormalities. He stated that Michaela's resuscitation was below the standards of medically accepted practice, in that she was not promptly intubated, there was no attempt to sustain her blood pressure with an IV line, there was no measurement of her blood pressure or blood Ph, and there was no measurement of her liver, electrolyte or other vital functions. He stated that more likely than not, her abnormalities today are due solely or in great measure to these failures. He stated that her MRI was compatible with an extrapyramidal movement disorder secondary to lack of oxygen at birth. He admitted that a recent article discussed the use and abuse of APGAR scores in predicting future outcomes. He stated that though perinatal asphyxia is an imprecise term, APGAR scores of less than 6 are coded as perinatal asphyxia. He acknowledged a study by Bonnucci (phonetic, because not admitted into evidence) indicated that 20 minute APGARs were the best predictors. Similarly, a study by Nelson (also spelled phonetically) determined that severe and prolonged low APGAR scores, 3 or lower at 10 minutes, were the best statistic correlative. In his own book, he stated that depressed APGAR, under 3 for 10 minutes or more, correlates with cerebral palsy. He admitted that a low APGAR alone did not predict perinatal asphyxia. He stated, however, that he did not rely on APGAR alone, and the most important factor he saw was that she was sick as a neonate. He acknowledged that Nelson was an authority and she has stated that Ph levels are a better predictor than low APGARs. He stated that fetuses and newborns can tolerate less oxygen than adults. He recognized that a low APGAR may be the first indication of an abnormal nervous system. He stated that on her MRI, her basal ganglia appeared normal. Her neurologic exam showed fluctuating tone. He stated that with extrapyramidal cerebral palsy, it was very difficult to assess a child's mental condition. His own exam indicated that she was severely retarded, but since he has learned about some of the things she is now able to do, he considers her moderately retarded. He acknowledged a study by Eryman (spelled phonetically) indicating that a five-year-old child with profound, severe, or suspected retardation who is immobile, has a gastrostomy, and is incontinent of urine and feces can be expected to live for five more years. He indicated, however, that those particular doctors focused primarily on the profoundly retarded, and he indicated that Michaela does not fit the above criteria, because she can scoot, which is a form of mobility. He finally indicated that he recommended physical, occupational, and

speech therapy, though he stated that there was no medical proof that it helps.

## 2. Dr. Anthony Barkovich

Dr. Barkovich is a pediatric neuroradiologist, who has written a textbook *Neuroimaging.* Based on an order from Judge Churchill, who was the judge on this case until trial, Dr. Barkovich performed a Magnetic Resonance Imaging scan (MRI) on Michaela on Sept. 19, 1989, and interpreted the findings. At the time he performed the scan, he was on the army payroll. He learned her medical history from Michaela's parents, but did not review her medical records. His scan showed a mild prominence of the cortical sulci, predominantly in the frontal and anterior temporal lobes. He stated it was otherwise pretty normal. He stated that to a reasonable degree of medical certainty there was no evidence of asphyxic brain damage on the MR scan. He stated that the first area affected by lack of oxygen is the watershed area. If no oxygen were getting to the brain, there would also be damage to the thalami, basal ganglia, and hippocampus. He states that he cannot tell the court, to a reasonable degree of medical certainty, what the cause of Michaela's injury is. He stated on cross-examination that an MRI might not pick up infarctions resulting from hypoxia. He further stated that the scan showed prominent lateral ventricles, which might indicate atrophy. Atrophy is consistent with hypoxia. He indicated that the prominent ventricles could indicate hypocephalus, but that in that case, the 3rd ventricle would be ballooned out. He states that there is some inconsistency in the MRI. He concludes that the scan is not diagnostic of a specific entity, though he speculates that it is most compatible with a genetic disorder. If her severe impairment were due to asphyxia, he would expect to find severe brain damage. The court notes that Dr. Griggs spent considerable time on cross-examination questioning the witness about the inconsequential matter of why his book listed him as an assistant professor, when he was thereafter made an associate professor.

## 3. Dr. Sharon Byrd

Dr. Byrd is a pediatric neuroradiologist. She reviewed the MRI performed by Dr. Barkovich. She reviews 12–15 MRIs daily and specializes in brain and spine images of children. She stated that an MRI is limited in the respect that it cannot pick up intercellular damage or subtle abnormalities. She determined that the MRI correlated with findings of perinatal asphyxia. She stated that children with extrapyramidal movement disorders usually had normal MRIs and the basal ganglia appeared normal. She stated that there is a spectrum of documented changes in cases of asphyxia at birth. She studied 153 children with cerebral palsy who demonstrated a wide variety of findings. (Ex. 108). The labor and delivery history showed normal to severe fetal distress; APGARs were 0–10 at 1, 5, 10, 15, 20 minutes. Ph was 6.9 to 7.3; newborns were normal to history of stupor, coma, hypotonia, absent to normal respirations, apneic spells, seizures were normal to decreased to absent; neonatal-infancy period showed difficulty feeding, apneic episodes, seizures and hypotonia. Later they developed classic forms of cerebral palsy, including spastic, choreoathetoid, ataxic or a combination. She showed the court several slides. In 10 children with spastic cerebral palsy, 2 showed a normal MRI. In 5 children with choreoathetoid cerebral palsy, 1 showed a normal MRI. Of the 15 children in the slides, she saw fetal distress, APGARs 5 or lower at 15 minutes, newborns who required endotracheal intubation, and assisted ventilation at birth, and had an absent or decreased heart rate and respirations and were cyanotic. The conclusion of her study, as partially represented by her slides was that 25% of patients who had suffered asphyxia at birth and later developed cerebral palsy had normal MRIs. She stated that it is rare to see changes in the basal ganglia on an MRI.

As far as specific findings on Michaela's MRI, Dr. Byrd saw moderate dilatation of the 3rd ventricle. The corpus callosum was normal. The basal ganglia was normal. She did not see changes classic for hypoxic ischemic encephalopathy, but

based on her research does not rule out the probability of asphyxia at birth. After Dr. Byrd had prepared her report, she reviewed Dr. Barkovich's report, with which she did not agree. She disagreed with his stating that the MRI supported a finding of a metabolic or genetic disorder. There was nothing in the MRI to support that conclusion, and to reach it, he would have had to have had the benefit of her clinical history and other tests, which he did not have. Similarly, she does not agree with the conclusion of Dr. Naidich, who recruited her to her current position. He states that because the MRI does not show classic signs of hypoxic ischemic encephalopathy, then the condition is ruled out. However, based on Dr. Byrd's research above, the MRI does not rule out asphyxia at birth.

### 4. Dr. Thomas P. Naidich

Dr. Naidich testified live. He is a neuroradiologist who specializes in imaging of the brain and spine in children. He found a minimal asymmetry of some of the ventricles and a slightly small splenium of the corpus callosum. He found the sulci and fissures normal, the signal intensity normal, no delay in myelination, no cavitation. He stated that the findings were nonspecific, and might have been found in perfectly normal kids. He stated that there is no evidence to support infarction, no thinning of the white matter, normal basal ganglia. He stated that the images showed no evidence of perinatal asphyxia. His opinion was that to a reasonable degree of medical certainty, Michaela's condition was not a result of perinatal asphyxia, but he does not know what the cause is—"I don't know who it is, but I know it isn't Uncle Joe." He states that he has never seen a case of documented brain asphyxia with a normal MRI. He has seen cases deemed brain asphyxia, but not proven, with a normal MRI. He stated that the best clinical judgment of doctors has a high error rate, and that they are wrong up to 20% of the time. He agrees with Dr. Byrd that in cases of clinical diagnosis of perinatal asphyxia, there is not always proof on the MRI. He disagrees, however, with her conclusion that the MRI is not inconsistent with perinatal asphyxia, because there is no proof in the MRI of perinatal asphyxia.

### 5. Dr. Josefine Vallarta

Dr. Vallarta testified live. She is a pediatric neurologist. She diagnoses and recommends treatment for children who are very developmentally delayed. She examined Michaela in April 1987 at Dr. Griggs' request. She came to no conclusions regarding the cause of her condition. She then asked Dr. Nupen to perform certain tests. She wanted a chromosome and urine study to rule out metabolic causes, she wanted a dysmorphology to examine genetic abnormalities. The tests who performed by Dr. Stephan, who is a specialist. The test results were normal, though she acknowledged that they could not rule out all possible causes. She asked to review the CT scans, one from June 1986 at Madigan and the other from Mott Children's Hospital. She also reviewed the birth records and a hearing evaluation. She determined that the CT scans showed mild atrophy of the brain and mild dilatation of the south side of the brain. She determined that Michaela's brain was not growing normally, probably because of damage to her brain at birth. A flash-evoked response test was normal, indicating that the optic nerve pathway was fine. Michaela's blindness is cortical, due to damage to the occipital portion of her brain and associated with perinatal asphyxia. A brain stem auditory evoked response test was normal. After a review of all the records and all the tests ordered, it was her opinion that the brain dysfunction is probably secondary to perinatal asphyxia. She states that Michaela was not intubated for six minutes after birth, when she should have been intubated immediately and given fluids to elevate her blood pressure. If that had been done, Michaela could be normal. She should have been monitored for blood gases, including a check of the ph, a check for acidosis, and a check of oxygen and carbon dioxide levels. These tests can be performed in seconds. There were early signs of brain damage in Michaela, including the fact that her pupils were first large and

then dilated, and the fact that her head size increased one centimeter in the first day.

Dr. Vallarta examined Michaela again in 1988. That test indicated that Michaela had athetoid quadriperises secondary to brain lesions in the basal ganglia. It is a type of cerebral palsy causing involuntary movement of arms and legs and loss of head control. A January 1990 examination showed Michaela's condition to be the same, except that she had made some progress in communication and had had a gastrostomy. Dr. Vallarta had no change of opinion regarding the cause. She stated that she could not predict Michaela's life expectancy, but it would be shorter than normal. She finally saw Michaela on Oct. 22, 1990, and found Michaela had made significant progress.

She stated that Michaela does not receive as much therapy as her team recommends in the Custer School in the Clover Park School District. The district is small and has trouble getting an adequate number of qualified therapists. She recommends that until age 21, Michaela have 3 hours of speech therapy each week, 2 hours of occupational therapy each week, 2 hours of physical therapy each week, and have an additional educational program. After age 21, Michaela will still need some therapy. She will need to see a neurologist once a year, unless her seizures increase. She will need follow-up by an orthopedist and an opthamologist as she gets older. She will need an annual physical. She will never be self-sufficient, and will need attendant care 24 hours/day. She will require periodic blood testing, once every six months.

## 6. Dr. Frank Miller

Dr. Miller is a perinatologist, who works with complicated or high risk pregnancies and labor and delivery. He is also a colonel in the active reserve. He reviewed Michaela's prenatal and birth records and the newborn records. On the fetal heart monitor tracing, he saw no evidence of machine malfunction. He also so no evidence of asphyxia or distress. He saw some insignificant stress. He saw occasional nonreassuring patterns, but they indicated no problem. He states that the monitor indicates a healthy baby up to the time it was disconnected—six minutes before birth. He states that to a reasonable degree of medical certainty, it is not foreseeable, based on the tracing, that Michaela would not be born normal. He saw no evidence of interpartum asphyxia. He would not have done testing on Michaela during birth, such as the scalp test. He sees no indication of a hyperirritated uterus, but acknowledges that the tracing is not that good. A hyperirritated uterus might cause damage to some fetuses, but that would be indicated on the monitor strip. It was not in this case. He states that there was no reason to predict that Mrs. King would go from 6 centimeters to 10 centimeters in 10 minutes. The delivery was precipitous and that can cause harm. Nevertheless, the tracing indicates no problem. The newborn showed no bruising or hematoma, there were no vaginal tears. There was no evidence of damage from the precipitous delivery. He stated that the last half-hour of birth did not cause Michaela's condition.

He indicated that a Pitocin induction was required, because it had been almost 24 hours since Mrs. King's membranes had ruptured. The dosage was properly administered and monitored. There is no indication that Pitocin caused Michaela's condition. He also indicated that it was not possible to accurately assess contractions with hand palpitations.

He indicated that the use of Nisentil was appropriate in light of Mrs. King's pain. There was some decrease in fetal heart rate variability, but that is common. When a laboring mother relaxes from the drug, she does not breathe as hard; however, her breathing would accelerate with contractions. Nisentil is quick acting. It does act as a potent respiratory depressant, and was taken off the market because of its effect on adults. His research indicates that it is absorbed through the placenta and also has a depressant effect on fetuses. Nevertheless there is no indication that Nisentil caused Michaela's condition. Just before

the monitor was disconnected, at 11:20, there was a late loss of beat to beat variability. There was no way for the staff to anticipate that Michaela would be born so severely depressed. If there had been some warnings, they might have been more attentive. However, he acknowledged that no one knows if Michaela was born breathing. In addition, at the time that Dr. Epstein towelled Michaela off, he could have determined that she was limp and hypoactive. He should have acted right away, and taken an immediate heart beat. He agrees that Michaela should have been intubated more quickly—as soon as she was placed on warmer. However, brief use of a bag and mask was appropriate, because it was quick, interim help.

He does not know the cause of Michaela's condition, but states it is not a result of interpartum asphyxia or perinatal asphyxia, because of the time between delivery and establishment of resuscitation. He is not prepared to state an opinion as to what caused the condition.

### 7. Dr. William Matview

Dr. Matview testified live. He is an obstetrician who works in Illinois. Forty percent of his practice is in maternal fetal medicine and high risk pregnancies. He states that there are two ways that the doctors in this case fell below the standard of care. First, they did not stop the Pitocin when there were indications of hyperactivity. Because of potential harm to mother and baby from hyperactivity, the standard required that the Pitocin be slowed down 1½ to 2 hours before birth. There is evidence on the fetal monitor strip of stress to the baby. The birth was clearly precipitous in that Mrs. King was dilated 6–7 cms. at 11:00 a.m., and was dilated 10 cms. and ready to deliver at 11:20 a.m. In such a precipitous labor, the baby can't get enough oxygen, because there isn't enough blood in the uterus. In addition, compression of the baby's head and body in the birth canal also causes an oxygen lag. The second area where care fell below the standard was the 5–minute delay in resuscitation. Aggressive resuscitation, including intubation, should have been began at 30 seconds to one minute after birth. In addition, the baby had respiratory depression from the Nisentil, and that should have been corrected immediately.

He stated that the prenatal care was within acceptable standards, and that spotting early in the pregnancy has no correlation to Michaela's problems.

He stated that the 0 APGAR would cause a build up of carbon dioxide, or acidosis, which would increase until Michaela was resuscitated. Her Ph score would be in the upper 6s. Michaela's condition could have been reversed by resuscitation, and there might have been some damage, but it would have been markedly less. On cross-examination, he indicated that 6–7 minutes before birth, the fetal heart monitor indicated that Michaela was fine. The decelerations on the strip were moderate. On basis of the tracing, he would not predict a 0 APGAR baby. He indicated that the precipitous labor was the cause of harm to this infant, but acknowledged that Friedman's *Management of Labor* (not introduced as an exhibit), an authoritative source, indicated that precipitous labor can have a protective effect on a fetus.

### 8. Dr. John McLaughlin

Dr. McLaughlin's testimony was presented by deposition. He is a developmental pediatrician, who draws up treatment plans for handicapped children and their families. He indicated that under the Education of All Handicapped Children's Act, schools are required to have resources, including occupational, speech and physical therapy and health services, necessary for the education of handicapped children. The program generally works. He does not think that Michaela needs 24 hour/day attendant care, only care for 6 hours/day to give relief to the family. She can receive the vast majority of physical therapy she needs from school up to age 21. She will only need additional therapy if she develops a medical condition that her doctor will want to control. She needs 1 hour/week of occupational therapy. She is currently getting

20–30 minutes. She needs two hours/week in speech therapy. That amount can be reduced by age 14. After age 21, 10 hours/year of speech therapy is reasonable. She is getting too much speech pathology now, and her special education teachers can handle her communication needs. There is a 50/50 chance that she will ever be able to work up to 4 switches. Her speech system can be maintained with 20 hours/year. She will not require a computer-based system. She will need regular lab tests. As an adult, she will need a yearly gynecological visit. He opines that she will work towards an out-of-home placement, which will cost $40,000/year. He admits that he has never been to the Custer School and is not sure exactly what therapy she is getting or who is giving it. He expects, based on the Eryman study, which he admits is based on retarded individuals, that Michaela will live to age 10. If she lives to age 15, she will live an additional 4.5 years. She is more prone to illness and disease. He does state, however, that there is a strong possibility that she will live to age 30. He also states that in the Eryman study, there is a substantial increase in age at mortality for mobile individuals.

To a reasonable degree of medical certainty, he considers her disability unexplained. It is not accounted for by the circumstances of her birth; it may be a degenerative process yet to be interpreted and diagnosed properly. He states that there is no hypoxic ischemic encephalopathy, no consequences on the MRI, relative normalcy in the first two months, and very late onset of seizures. He states that the screens do not pick up a number of degenerative disorders that could have caused this problem. The testing is incomplete.

He states that Michaela does need prosthetic devices. He also states that he will follow Nola Marriner's recommendations regarding therapy and augmentative communication. He states that Michaela's birth was precipitous, but it was under control. He acknowledges that a number of Michaela's neurologic signs were consistent with asphyxia, including decreased Moro reflex and weak cry. He acknowledges that no tests were done for organ damage and that there are no signs of congenital or genetic abnormalities.

9. Dr. Mark S. Scher

Dr. Scher testified live. He is a pediatric neurologist, studying neonatal neurology and epilepsy. He examined Michaela's labor and delivery records. He states that to a reasonable degree of medical certainty, there is no causal relation between events at birth and her current condition. He states that there is not sufficient evidence of an asphyxial event that could cause this harm. Michaela lacks the clinical sequence, which requires a much more depressed child, end organ damage, and active seizures. He states that 2½ months was a strange time for seizures. He states that the clinical pattern for an asphyxiated infant is as follows: if there is slight asphyxia, the baby is jittery, but the outcome is fine; if there is moderate asphyxia, the baby is depressed and experiences lethargy and seizures; if there is severe asphyxia, the baby is in a deep, unresponsive coma, which slowly resolves over the next week or so. He states that Michaela was not normal from birth on. Nisentil had an initial, transitory effect on the early APGARs. Her abnormal tone and inability to suck and swallow suggest a prenatal or metabolic problem. Her APGAR scores are not consistent with asphyxia and indicate that she should have been free of deficits. He states that she did not enter the delivery process in a normal state and that abnormality interacted with the Nisentil. Nothing in the fetal heart tracings looked dramatic. There are some tests available that could get closer to whether there are metabolic or biochemical or other reasons for the disabilities.

He stated that it is not acceptable to use the temporal relationship of a low APGAR to establish causation. It is improper to use deductive reasoning to diagnose this child. The late APGARs in this case were much stronger, and he would have told the parents that Michaela should have had a good outcome. Many children could go

through a six minute delay in intubation and be normal, because newborns have a strong reserve.

On cross, he stated that if the monitor was taken off between 11:20 and 11:25, there hypothetically could have been 17 minutes without a heartbeat. It is important to study blood gases to determine asphyxia and acidosis. If there is acidosis, there can be a cascade of medical reactions. He defines asphyxia as sufficient loss of blood oxygen to the brain to cause nerve cell damage, but acknowledges that under other definitions, including textbook definitions, Michaela could have suffered asphyxia.

He admitted that there was a breach of the standard of care in both the delay in intubation and the removal of the tube so quickly, without testing blood gases. He testified that she was not a nuerologically normal newborn, because she was floppy and had dilated and then constricted pupils. He stated that it is difficult to assess a subtle seizure, but usually they involve a broad range of movements, including stiffening and repetitive bicycling. There was no evidence of this type of seizure in Michaela.

10. Dr. Philip Sunshine

Dr. Sunshine testified live. He is a pediatrician specializing in neonatal medicine. He studies and cares for newborns to age one month. He has resuscitated 500–1000 infants. He reviewed Michaela's and Mrs. King's medical records, he reviewed all or parts of depositions of Drs. Menkes, Caro and Epstein, and Nurse Kinnaird. He determined that despite the rapid second stage of labor, there was no reason to foresee a problem at delivery. The fetal heart tracing was normal. He stated that the stimulation of the baby was appropriate. The bag and mask was appropriate, but should only have been used for 15–30 seconds, 60 as an outer limit. He states that intubation should have occurred at 2 minutes. He states, however, to a reasonable degree of medical certainty, that the delay in intubation did not cause Michaela's

neurologic condition. He does not know the cause. Her defects are not those of an infant who has suffered acute or chronic asphyxia. Those infants show cardio-pulmonary difficulties, are completely unresponsive, and have seizures within 24–48 hours. He states that her depressed condition was due to Nisentil. She responded so quickly to intubation that one would expect little subsequent difficulty. He would expect her to have 12–13 minutes of complete asphyxiation before there would be neurologic damage. He states that there was no causation in the doctors' failure to give sodium bicarbonate, take her blood pressure and measure her ph. There was no time during the resuscitation, and Michaela responded quickly. He recognizes that acidosis can cause problems, but thinks it highly improbable that it caused these problems. It is not associated with cerebral palsy. Nisentil didn't cause her problem. Though she was depressed at birth, the newborn period did not contribute to her problem. Studies suggest that she should have done well. He knows Michaela's problem is not a result of perinatal asphyxia, but he does not know what the cause is.

He discussed a 1988 article by Dr. Karen Nelson (not offered in evidence) describing the epidemiology of cerebral palsy and mental retardation. She established four criteria for diagnosing a neurologic conditions a result of perinatal asphyxia:

1) interpartum difficulty—asphyxia
2) other organ difficulties, newborn course consistent with asphyxia
3) other causes rules out
4) all studies complete

Dr. Sunshine agrees with these criteria and finds them compatible with his clinical experience. He states that if Michaela had suffered perinatal asphyxia, her nursery report would have indicated that she could not feed, that she had severe respiratory difficulties, and apparent, difficult to control seizures. Michaela urinated, she passed normal stools, she had normal weight loss. These suggest no other organs were involved. Hypotonia, her primary difficulty, is found in less than 10%

of cases of perinatal asphyxia. He stated that, though tests done on her are pretty thorough, the workup is not all-conclusive. The best predictor of etymology would be depression in the newborn period such that the APGAR would be 1–3 at 10 minutes or more. If it is 4 or greater at 10 minutes, the likelihood of cerebral palsy is less than 1%. It is not foreseeable that Michaela would develop cerebral palsy. The best test for causation of outcome is whether the outcome is predictable. He stated that failure to identify an alternate cause is not sufficient basis for blaming the obstetrical management. He states that Dr. Menkes testimony is unreliable because he pieced together all the pieces in retrospect.

He testified that the International Classification of Disease required a discharge diagnosis of severe perinatal asphyxia. On cross, he acknowledged that medical studies, from 1959 and 1972 (neither of which were offered in evidence) indicate that asphyxia at birth results in brain lesions in the thalamus and basal ganglia, but spared the cerebral cortex. An MRI looks at the cerebral cortex, and damage to the basal ganglia will appear only if significant. He states, however, that the apparent retardation suggests that Michaela is retarded, and that would indicate damage in the cerebral cortex.

He testified that in a seminar regarding medical issues in neonatal medicine for attorneys, he stated in a lecture that one should evaluate an infant's condition immediately, and not wait for the one minute APGAR. Optimal care dictates that tube not be immediately removed, and that blood gases and blood pressure be checked.

He acknowledged that in asphyxia the brain is most susceptible to lack of oxygen. Other organ damage can be transitory. He stated that Michaela gained tone in her hospital course, but was still floppy at discharge. There was difficulty with her suck, which is a frequent problem with asphyxiated infants, and she had sluggish, constricted pupils at birth, then dilated pupils.

Though she was not a normal newborn, he states that she was abnormal long before birth. Children with metabolic abnormalities and neurological problems don't tolerate labor well.

He did not consider the facial grimaces evidence of seizure. Doctors should do an EEG, however, if there is any indication of a seizure. Her cortical blindness could be associated with asphyxia. He acknowledged that Michaela did not cry when the IV was inserted, and that she had a decreased Moro reflex, which is a reflex highly indicative of alertness. He states that if there had been asphyxia, her hearing would most likely be affected. Her cerebral cortex is involved with the damage, as is indicated by her cortical blindness. Life expectancy of a brain damaged baby depends on her caretakers. He concludes that one cannot extrapolate her condition from the pieces of the puzzle.

## APPENDIX II

### GLOSSARY OF MEDICAL TERMINOLOGY

**Acidosis**
Clinical term commonly used to indicate acidema or a lowered blood bicarbonate, measured by blood sample as RH and blood gases. Newborn "normal" is generally between 7.35 and 7.45. Less that 7.20 is unacceptable and denotes serious acidosis.

**Anoxia**
Oxygen deficiency; oxygen lack; a condition in which the cells of the body do not have or cannot utilize sufficient oxygen to perform normal function.

**APGAR Score**
Evaluation of newborn infant by five categories; heart rate, respirations, muscle tone, reflex irritability and color. Each is scored on a category of zero, one or two. APGAR

scoring is once every five minutes for up to 20 minutes unless two successive scores are eight or greater.

**Apnea**
(Apneic) A period of not breathing for more than 15 to 20 seconds. Common event in the premature baby.

**Asphyxia**
Suffocation. It is condition in which there is decreased oxygen and increased carbon dioxide in the blood and tissues with resultant acidosis.

**Atrophy**
The wasting away or diminution in size of cell, tissue, organ or part.

**Basal Ganglia**
A group of forebrain nuclei situated within the telencephalon or diencephalon but below the cortex, historically having included some or all of the following: thalamus, caudate and lentiform nuclei, amygdaloid nucleus, claustrum, tuber cinereum, geniculate bodies and even the corpora quadrigemina of the mid brain. At the present time largely limited to the first three mentioned: thalamus, caudate and lentiform nuclei.

**Cerebral Cortex**
Cortex of the brain, composed mainly of gray matter.

**Cerebral Fossa**
Any one of the depressions on each side of the floor of the cranial cavity, containing the frontal lobe, the temporal lobe and the cerebellum and distinguished respectively as anterior, middle and posterior.

**Cerebral Palsy**
A broad term to describe any one of a group of conditions used to describe difficulties with coordinated movements and affecting control of the motor system, due to lesions in various parts of the brain and occurring as a result of birth injury or prenatal cerebral defect, metabolic, degenerative and genetic afflictions of the brain. Disability is identified as hemiplegia—one side of the body, diplegia—both legs, quadriplegia—all extremities.

**Convulsion**
A violent involuntary contraction or series of contractions of the voluntary muscle. A convulsion not excited by any external cause but due to a lesion of the central nervous system. Convulsion or seizures in the neonate are subtle and easily missed.

**Deceleration**
A slowing of the fetal heart rate associated with a uterine contraction.

**Early Deceleration**
An early deceleration is one that begins with the onset of a contraction, reaches its peak with the peak of contraction and then returns to normal baseline levels as the contraction ends. These decelerations appear to be related to compression of the fetal head. Early decelerations are not associated with fetal hypoxia.

**Late Deceleration**
A late deceleration is one that begins after the contraction starts but reaches a peak well after the peak of contraction is reached and does not return to baseline until 30 to 60 seconds after the contraction is completed. These decelerations are related primarily to uteroplacental insufficiency (e.g., placental disorder, uterine hyperactivity, and maternal hypotension) and are mediated by fetal hypoxia. Duration of asphyxia with late decelerations required to produce brain injury is not entirely clear.

**Variable Deceleration**
The most commonly observed fetal heart rate deceleration. This is a slowing of the fetal heart rate that may begin before, with or after the onset of the uterine contraction and is variable in duration. This deceleration pattern is primarily due to varying degrees of umbilical cord compres-

sion. The mechanism of the bradycardia (slowing of heart rate) is considered to be an increase in peripheral resistance which leads to fetal hypertension that in turn causes pororeceptor-stimulated, vagal-mediated bradycardia. Distinction of early from late cord compression can be made on the basis of determination of fetal carbon dioxide level and base excess by doing scalp Ph or blood gas studies. When variable decelerations are accompanied by or evolved into late decelerations or when beat-to-beat variability is diminished or lost, the likelihood of significant fetal hypoxia is markedly enhanced.

**Electroencephalogram** (EEG) A tracing of the electrical activity of the brain; most helpful to identify presence or absence of seizure activity.

**Encephalopathy** Any abnormal condition affecting the brain.

**Endotracheal** Within the trachea or windpipe.

**Endotracheal Intubation** Placing a tube into the trachea using a laryngoscope to assist or ventilate adequately. The tube is passed through the mouth. For long term ventilation, passed through the nose.

**Fetus** The unborn offspring; the child in the womb after the end of the second month; before that time it is called the embryo.

**Flash Visual Evoked Response** A test using a flash of light and brain wave tracings to track nerve potentials to determine whether vision loss is central or peripheral.

**Ganglion** Any collection or mass of nerve cells that serves as a center of a nervous influence.

**Galactosemia** An inborn error of metabolism characterized by decreased ability to convert galactose to glucose. It is due to congenital absence of the enzyme which is required for conversion of galactose to glucose and its dirivatives.

**Gastrostomy** The creation of an artificial gastric fistula or opening in the outer abdominal wall into the stomach. The operation of forming an opening into the stomach through which a tube can be placed from without into the stomach.

**Hypotonia** Lack of tone or reduction in muscle tone. "Limp like a rag doll."

**Hypoxemia** Diminished amount of oxygen in the blood.

**Hypoxia** Lack of sufficient oxygen.

**Hypoxic–Ischemic Encephalopathy** In general refers to the condition of asphyxia in the perinatal period. .It is the total complex of asphyxia and associated neuropathological (abnormal condition) of the brain; low APGAR scores at one, five and ten minutes and/or low blood Ph (acidosis); abnormal neurological findings on examination and abnormal neonatal course that is characterized by decreased responsiveness; decreased major organ function or damage, usually manifested by the kidneys, heart, skin and intestine; seizures and failure to feed well. Various classifications of severity such as mild, moderate and severe have been advanced including mixtures of each; not each and every proposed abnormality has to be present to satisfy the diagnosis.

**Intubate** Insert an endotracheal tube through the mouth or nose into the trachea to provide assisted ventilation.

**Ischemia** Diminished amount of blood perfusing the brain; either from decrease of blood pressure or decrease of blood volume to the brain.

| | |
|---|---|
| **Level of Alertness** | The most sensitive of all neurological functions as it depends on the integrity of several levels of the central nervous system. A test performed on neonates by a gentle shake to arouse the infant from apparent sleep. Other tests for alertness are vigorous crying during wakefulness, attention to visual and auditory stimulation. |
| **Meconium** | First feces of a newborn infant, made up of salts, liquor amnii, mucus, bile and epithelial cells; greenish black to light brown, almost odorless and of a tarry consistency. Present 3 or 4 days after birth. |
| **Metabolic Acidosis** | Low blood Ph with normal or low carbon dioxide. Condition where there is buildup of lactic acidosis in the cells and in the blood. Metabolic acidosis triggers a cascade of chemical reactions in the brain that can result in direct damage to brain cells. |
| **Metabolic Screen** | A test of the urine for various amino acids and lipoids to determine whether the individual has an inborn error of metabolism thought to be hereditary. |
| **Moro Reflex** | A reflex present in all newborns that is elicited best by sudden dropping of the baby's head in relation to the trunk. The reflex consists of the baby's opening of the hands and extension and abduction of the upper extremities followed by anterior flexion (embracing) of the upper extremities and an audible cry. Moro reflex disappears by six months of age in normal infants. |
| **Narcan** | A narcotic antagonist. Used to reverse or reduce the effects of narcotic depression, including respiratory depression. |
| **Neonatal** | Pertaining to the newborn or period of birth. Sometimes defined as up to the first two months after birth. |
| **Neonate** | Newly born infant. |
| **Neonatologist** | Pediatrician who specializes and limits his practice to the care and treatment of neonates. |
| **Nisentil** | A synthetic narcotic that may produce respiratory depression. Nisentil was withdrawn from the market sometime after 1987 or 1988. |
| **Nystogmoid Movements** | Constant, involuntary, cyclical movement of the eyeball. |
| **Oxytocin** | A synthetic polypeptide that is identical to the naturally occurring oxytocin made in the posterior pituitary lobe. Oxytocin exerts a selective action on the smooth musculature of the uterus to stimulate rhythmic contractions and to increase the frequency of existing contractions and raise the tone of the uterine musculature. It is indicated for induction of labor in patients with a medical indication for such induction; stimulation or reenforcement of labor in selected cases of uterine inertia and is adjunctive therapy in the management of incomplete or inevitable abortion. |
| **Pediatrics** | A branch of medicine which examines and treats children and their development, and cares for the diseases of children. Generally encompasses the period from birth to the age of 14. |
| **Perinatal** | Time period during labor, delivery and birth. |
| **Perinatal Asphyxia** | Asphyxia occurring anytime during the period of labor, delivery or birth. |
| **Perinatologist** | Physician who sub-specializes in and has passed special boards in the care of women and fetuses at risk. |

| Pitocin | Synthetic oxytocin. Has the same action, contraindictions, warning and cautions as oxytocin. |
| Precipitate Labor and Delivery | (From *Williams Obstetrics*, 17th Edition, p. 647) Precipitate, that is, extremely rapid, labor and delivery. May result from an abnormally low resistance of the soft parts of the birth canal, from abnormally strong uterine and abdominal contractions, or *very rarely*, from the absence of painful sensations and thus a lack of awareness of vigorous labor. |
| Respiratory Acidosis | Condition where there is a buildup of carbon dioxide in the blood from insufficient ventilation of the lungs. There is increased rate of breathing in an attempt to rid the blood of the carbon dioxide. If the respiratory control center of the central nervous system is depressed, increased respirations may not occur. |
| Seizure | An attack of epilepsy. Convulsion. A seizure results when there is an excessive synchronous electrical discharge (depolarization) of neurons within the central nervous system. |
| Sucking and Swallowing in Newborn | The most common cause of disturbances of sucking and swallowing in the newborn period is the more generalized depression of the central nervous system function associated with encephalopathies including perinatal asphyxia. |

## APPENDIX III

Medical and Health Care Costs, pp. 1–13

| PLAINTIFF'S COSTS | | PRESENT VALUE |
| --- | --- | --- |
| YEAR | HOME CARE | MICHIGAN 5% METHOD |
| 1991 | 72,360.00 | 72,360.00 |
| 1992 | 75,487.40 | 68,914.29 |
| 1993 | 78,749.96 | 65,781.82 |
| 1994 | 82,153.54 | 62,921.74 |
| 1995 | 85,704.21 | 60,300.00 |
| 1996 | 89,408.35 | 57,888.00 |
| 1997 | 93,272.58 | 55,661.54 |
| 1998 | 97,303.82 | 53,600.00 |
| 1999 | 101,509.29 | 51,685.71 |
| 2000 | 105,896.52 | 49,903.45 |
| 2001 | 110,473.37 | 48,240.00 |
| 2002 | 115,248.03 | 46,683.87 |
| 2003 | 120,229.05 | 45,225.00 |
| 2004 | 125,425.35 | 43,854.55 |
| 2005 | 130,846.23 | 42,564.71 |
| 2006 | 136,501.41 | 41,348.57 |
| 2007 | 155,153.33 | 43,800.00 |
| 2008 | 161,859.05 | 42,616.22 |
| 2009 | 168,854.60 | 41,494.74 |
| 2010 | 176,152.50 | 40,430.77 |
| 2011 | 183,765.81 | 39,420.00 |
| 2012 | 191,708.17 | 38,458.54 |
| 2013 | 199,993.79 | 37,542.86 |
| 2014 | 208,637.52 | 36,669.77 |
| 2015 | 217,654.84 | 35,836.36 |
| 2016 | 227,061.88 | 35,040.00 |
| 2017 | 236,875.49 | 34,278.26 |
| 2018 | 247,113.25 | 33,548.94 |
| 2019 | 257,793.49 | 32,850.00 |

| PLAINTIFF'S COSTS | | PRESENT VALUE |
|---|---|---|
| YEAR | HOME CARE | MICHIGAN 5% METHOD |
| 2020 | 268,935.32 | 32,179.59 |

| PLAINTIFF'S COSTS | | PRESENT VALUE |
|---|---|---|
| YEAR | PHYSICAL THERAPY* | MICHIGAN 5% METHOD |
| 1991 | 5,594.40 | 5,594.40 |
| 1992 | 5,986.01 | 5,328.00 |
| 1993 | 6,405.03 | 5,085.82 |
| 1994 | 6,853.38 | 4,864.70 |
| 1995 | 7,333.12 | 4,662.00 |
| 1996 | 7,846.44 | 4,475.52 |
| 1997 | 8,395.69 | 4,303.38 |
| 1998 | 8,983.38 | 4,144.00 |
| 1999 | 9,612.22 | 3,996.00 |
| 2000 | 10,285.08 | 3,858.21 |
| 2001 | 11,005.03 | 3,729.60 |
| 2002 | 11,775.38 | 3,609.29 |
| 2003 | 12,599.66 | 3,496.50 |
| 2004 | 13,481.64 | 3,390.55 |
| 2005 | 14,425.35 | 3,290.82 |
| 2006 | 10,676.95 | 2,211.32 |
| 2007 | 1,835.06 | 345.33 |
| 2008 | 1,963.52 | 336.00 |
| 2009 | 2,100.97 | 327.16 |
| 2010 | 2,248.03 | 318.77 |
| 2011 | 2,405.40 | 310.80 |
| 2012 | 2,573.77 | 303.22 |
| 2013 | 2,753.94 | 296.00 |
| 2014 | 2,946.71 | 289.12 |
| 2015 | 3,152.98 | 282.55 |
| 2016 | 3,373.69 | 276.27 |
| 2017 | 3,609.85 | 270.26 |
| 2018 | 3,862.54 | 264.51 |
| 2019 | 4,132.92 | 259.00 |
| 2020 | 4,422.22 | 253.71 |

* Costs for 1991–2006 reflect an adjustment to the number of weeks of therapy per year (45 weeks).

| PLAINTIFF'S COSTS | | PRESENT VALUE |
|---|---|---|
| YEAR | OCCUPATIONAL THERAPY AGE< = 21* | MICHIGAN 5% METHOD |
| 1991 | 9,506.25 | 9,506.25 |
| 1992 | 10,171.69 | 9,053.57 |
| 1993 | 10,883.71 | 8,642.05 |
| 1994 | 11,645.57 | 8,266.30 |
| 1995 | 12,460.75 | 7,921.88 |
| 1996 | 13,333.01 | 7,605.00 |
| 1997 | 14,266.32 | 7,312.50 |
| 1998 | 15,264.96 | 7,041.67 |
| 1999 | 16,333.51 | 6,790.18 |
| 2000 | 17,476.85 | 6,556.03 |
| 2001 | 18,700.23 | 6,337.50 |

| PLAINTIFF'S COSTS | | PRESENT VALUE |
| | OCCUPATIONAL THERAPY | MICHIGAN |
| YEAR | AGE $\leq$ 21* | 5% METHOD |
|---|---|---|
| 2002 | 20,009.25 | 6,133.06 |
| 2003 | 21,409.90 | 5,941.41 |
| 2004 | 22,908.59 | 5,761.36 |
| 2005 | 24,512.19 | 5,591.91 |
| 2006 | 17,310.50 | 3,585.21 |
| 2007 | 0.00 | 0.00 |
| 2008 | 0.00 | 0.00 |
| 2009 | 0.00 | 0.00 |
| 2010 | 0.00 | 0.00 |
| 2011 | 0.00 | 0.00 |
| 2012 | 0.00 | 0.00 |
| 2013 | 0.00 | 0.00 |
| 2014 | 0.00 | 0.00 |
| 2015 | 0.00 | 0.00 |
| 2016 | 0.00 | 0.00 |
| 2017 | 0.00 | 0.00 |
| 2018 | 0.00 | 0.00 |
| 2019 | 0.00 | 0.00 |
| 2020 | 0.00 | 0.00 |

* Costs include an adjustment to the number of weeks of therapy per year (45 weeks).

| PLAINTIFF'S COSTS | | PRESENT VALUE |
| | OCCUPATIONAL THERAPY | MICHIGAN |
| YEAR | AGE > 21 | 5% METHOD |
|---|---|---|
| 1991 | 0.00 | 0.00 |
| 1992 | 0.00 | 0.00 |
| 1993 | 0.00 | 0.00 |
| 1994 | 0.00 | 0.00 |
| 1995 | 0.00 | 0.00 |
| 1996 | 0.00 | 0.00 |
| 1997 | 0.00 | 0.00 |
| 1998 | 0.00 | 0.00 |
| 1999 | 0.00 | 0.00 |
| 2000 | 0.00 | 0.00 |
| 2001 | 0.00 | 0.00 |
| 2002 | 0.00 | 0.00 |
| 2003 | 0.00 | 0.00 |
| 2004 | 0.00 | 0.00 |
| 2005 | 0.00 | 0.00 |
| 2006 | 0.00 | 0.00 |
| 2007 | 1,918.91 | 361.11 |
| 2008 | 2,053.23 | 351.35 |
| 2009 | 2,196.96 | 342.11 |
| 2010 | 2,350.74 | 333.33 |
| 2011 | 2,515.29 | 325.00 |
| 2012 | 2,691.37 | 317.07 |
| 2013 | 2,879.76 | 309.52 |
| 2014 | 3,081.34 | 302.33 |
| 2015 | 3,297.04 | 295.45 |
| 2016 | 3,527.83 | 288.89 |
| 2017 | 3,774.78 | 282.61 |
| 2018 | 4,039.01 | 276.60 |
| 2019 | 4,321.74 | 270.83 |

| PLAINTIFF'S COSTS | | PRESENT VALUE |
|---|---|---|
| YEAR | OCCUPATIONAL THERAPY AGE > 21 | MICHIGAN 5% METHOD |
| 2020 | 4,624.27 | 265.31 |

| PLAINTIFF'S COSTS | | PRESENT VALUE |
|---|---|---|
| YEAR | PUMP | MICHIGAN 5% METHOD |
| 1991 | 750.00 | 750.00 |
| 1992 | 0.00 | 0.00 |
| 1993 | 0.00 | 0.00 |
| 1994 | 0.00 | 0.00 |
| 1995 | 923.49 | 625.00 |
| 1996 | 0.00 | 0.00 |
| 1997 | 0.00 | 0.00 |
| 1998 | 0.00 | 0.00 |
| 1999 | 1,137.12 | 535.71 |
| 2000 | 0.00 | 0.00 |
| 2001 | 0.00 | 0.00 |
| 2002 | 0.00 | 0.00 |
| 2003 | 1,400.17 | 468.75 |
| 2004 | 0.00 | 0.00 |
| 2005 | 0.00 | 0.00 |
| 2006 | 0.00 | 0.00 |
| 2007 | 1,724.07 | 416.67 |
| 2008 | 0.00 | 0.00 |
| 2009 | 0.00 | 0.00 |
| 2010 | 0.00 | 0.00 |
| 2011 | 2,122.89 | 375.00 |
| 2012 | 0.00 | 0.00 |
| 2013 | 0.00 | 0.00 |
| 2014 | 0.00 | 0.00 |
| 2015 | 2,613.97 | 340.91 |
| 2016 | 0.00 | 0.00 |
| 2017 | 0.00 | 0.00 |
| 2018 | 0.00 | 0.00 |
| 2019 | 3,218.65 | 312.50 |
| 2020 | 0.00 | 0.00 |

| PLAINTIFF'S COSTS | | PRESENT VALUE | | |
|---|---|---|---|---|
| YEAR | SPEECH/ORAL THERAPY* | HOERNEMAN METHOD | MICHIGAN 5% METHOD | EISENSTADT/ ECONOMIC METHOD |
| 1991 | 5,040.00 | | 5,040.00 | |
| 1992 | 5,392.80 | | 4,800.00 | |
| 1993 | 5,770.30 | | 4,581.82 | |
| 1994 | 6,174.22 | | 4,382.61 | |
| 1995 | 6,606.41 | | 4,200.00 | |
| 1996 | 7,068.86 | | 4,032.00 | |
| 1997 | 7,563.68 | | 3,876.92 | |
| 1998 | 8,093.14 | | 3,733.33 | |
| 1999 | 8,659.66 | | 3,600.00 | |
| 2000 | 9,265.83 | | 3,475.86 | |
| 2001 | 9,914.44 | | 3,360.00 | |
| 2002 | 10,608.45 | | 3,251.61 | |

PLAINTIFF'S COSTS PRESENT VALUE

| YEAR | SPEECH/ORAL THERAPY* | HOERNEMAN METHOD | MICHIGAN 5% METHOD | EISENSTADT/ ECONOMIC METHOD |
|------|------|------|------|------|
| 2003 | 11,351.05 | | 3,150.00 | |
| 2004 | 12,145.62 | | 3,054.55 | |
| 2005 | 12,995.81 | | 2,964.71 | |
| 2006 | 9,177.65 | | 1,900.80 | |
| 2007 | 0.00 | | 0.00 | |
| 2008 | 0.00 | | 0.00 | |
| 2009 | 0.00 | | 0.00 | |
| 2010 | 0.00 | | 0.00 | |
| 2011 | 0.00 | | 0.00 | |
| 2012 | 0.00 | | 0.00 | |
| 2013 | 0.00 | | 0.00 | |
| 2014 | 0.00 | | 0.00 | |
| 2015 | 0.00 | | 0.00 | |
| 2016 | 0.00 | | 0.00 | |
| 2017 | 0.00 | | 0.00 | |
| 2018 | 0.00 | | 0.00 | |
| 2019 | 0.00 | | 0.00 | |
| 2020 | 0.00 | | 0.00 | |

* Costs include an adjustment to the number of weeks of therapy per year (45 weeks).

PLAINTIFF'S COSTS PRESENT VALUE

| YEAR | SPEECH PATHOLOGY | MICHIGAN 5% METHOD |
|------|------|------|
| 1991 | 17,784.00 | 17,784.00 |
| 1992 | 19,028.88 | 16,937.14 |
| 1993 | 20,360.90 | 16,167.27 |
| 1994 | 21,786.16 | 15,464.35 |
| 1995 | 23,311.20 | 14,820.00 |
| 1996 | 24,942.98 | 14,227.20 |
| 1997 | 26,688.99 | 13,680.00 |
| 1998 | 28,557.22 | 13,173.33 |
| 1999 | 30,556.22 | 12,702.86 |
| 2000 | 32,695.16 | 12,264.83 |
| 2001 | 34,983.82 | 11,856.00 |
| 2002 | 37,432.69 | 11,473.55 |
| 2003 | 40,052.98 | 11,115.00 |
| 2004 | 42,856.68 | 10,778.18 |
| 2005 | 45,856.65 | 10,461.18 |
| 2006 | 32,383.97 | 6,707.11 |
| 2007 | 0.00 | 0.00 |
| 2008 | 0.00 | 0.00 |
| 2009 | 0.00 | 0.00 |
| 2010 | 0.00 | 0.00 |
| 2011 | 0.00 | 0.00 |
| 2012 | 0.00 | 0.00 |
| 2013 | 0.00 | 0.00 |
| 2014 | 0.00 | 0.00 |
| 2015 | 0.00 | 0.00 |
| 2016 | 0.00 | 0.00 |
| 2017 | 0.00 | 0.00 |
| 2018 | 0.00 | 0.00 |
| 2019 | 0.00 | 0.00 |

| PLAINTIFF'S COSTS | | PRESENT VALUE |
|---|---|---|
| YEAR | SPEECH PATHOLOGY | MICHIGAN 5% METHOD |
| 2020 | 0.00 | 0.00 |

| PLAINTIFF'S COSTS | | PRESENT VALUE |
|---|---|---|
| YEAR | TEAM EVALUATION | MICHIGAN 5% METHOD |
| 1991 | 1,000.00 | 1,000.00 |
| 1992 | 1,070.00 | 952.38 |
| 1993 | 1,144.90 | 909.09 |
| 1994 | 1,225.04 | 869.57 |
| 1995 | 1,310.80 | 833.33 |
| 1996 | 1,402.55 | 800.00 |
| 1997 | 1,500.73 | 769.23 |
| 1998 | 1,605.78 | 740.74 |
| 1999 | 1,718.19 | 714.29 |
| 2000 | 1,838.46 | 689.66 |
| 2001 | 1,967.15 | 666.67 |
| 2002 | 2,104.85 | 645.16 |
| 2003 | 2,252.19 | 625.00 |
| 2004 | 2,409.85 | 606.06 |
| 2005 | 2,578.53 | 588.24 |
| 2006 | 1,820.96 | 377.14 |
| 2007 | 0.00 | 0.00 |
| 2008 | 0.00 | 0.00 |
| 2009 | 0.00 | 0.00 |
| 2010 | 0.00 | 0.00 |
| 2011 | 0.00 | 0.00 |
| 2012 | 0.00 | 0.00 |
| 2013 | 0.00 | 0.00 |
| 2014 | 0.00 | 0.00 |
| 2015 | 0.00 | 0.00 |
| 2016 | 0.00 | 0.00 |
| 2017 | 0.00 | 0.00 |
| 2018 | 0.00 | 0.00 |
| 2019 | 0.00 | 0.00 |
| 2020 | 0.00 | 0.00 |

| PLAINTIFF'S COSTS | | PRESENT VALUE |
|---|---|---|
| YEAR | SUPP. GASTRONOMY | MICHIGAN 5% METHOD |
| 1991 | 7,471.55 | 7,471.55 |
| 1992 | 7,908.64 | 7,115.76 |
| 1993 | 8,371.29 | 6,792.32 |
| 1994 | 8,861.01 | 6,497.00 |
| 1995 | 9,379.38 | 6,226.29 |
| 1996 | 9,928.07 | 5,977.24 |
| 1997 | 10,508.87 | 5,747.35 |
| 1998 | 11,123.64 | 5,534.48 |
| 1999 | 11,774.37 | 5,336.82 |
| 2000 | 12,463.17 | 5,152.79 |
| 2001 | 13,192.26 | 4,981.03 |
| 2002 | 13,964.01 | 4,820.35 |
| 2003 | 14,780.91 | 4,669.72 |
| 2004 | 15,645.59 | 4,528.21 |

| PLAINTIFF'S COSTS | | PRESENT VALUE | |
|---|---|---|---|
| YEAR | SUPP. GASTRONOMY | | MICHIGAN 5% METHOD |
| 2005 | 16,560.86 | | 4,395.03 |
| 2006 | 17,529.67 | | 4,269.46 |
| 2007 | 18,555.15 | | 4,150.86 |
| 2008 | 19,640.63 | | 4,038.68 |
| 2009 | 20,789.60 | | 3,932.39 |
| 2010 | 22,005.80 | | 3,831.56 |
| 2011 | 23,293.14 | | 3,735.77 |
| 2012 | 24,655.78 | | 3,644.66 |
| 2013 | 26,098.15 | | 3,557.88 |
| 2014 | 27,624.89 | | 3,475.14 |
| 2015 | 29,240.94 | | 3,396.16 |
| 2016 | 30,951.54 | | 3,320.69 |
| 2017 | 32,762.21 | | 3,248.50 |
| 2018 | 34,678.79 | | 3,179.38 |
| 2019 | 36,707.50 | | 3,113.15 |
| 2020 | 38,854.89 | | 3,049.61 |

| PLAINTIFF'S COSTS | | PRESENT VALUE | |
|---|---|---|---|
| YEAR | PEDIATRICIAN | | MICHIGAN 5% METHOD |
| 1991 | 588.90 | | 588.90 |
| 1992 | 633.18 | | 560.86 |
| 1993 | 680.80 | | 535.36 |
| 1994 | 732.00 | | 512.09 |
| 1995 | 787.04 | | 490.75 |
| 1996 | 846.23 | | 471.12 |
| 1997 | 909.86 | | 453.00 |
| 1998 | 978.29 | | 436.22 |
| 1999 | 694.22 | | 277.62 |
| 2000 | 0.00 | | 0.00 |
| 2001 | 0.00 | | 0.00 |
| 2002 | 0.00 | | 0.00 |
| 2003 | 0.00 | | 0.00 |
| 2004 | 0.00 | | 0.00 |
| 2005 | 0.00 | | 0.00 |
| 2006 | 0.00 | | 0.00 |
| 2007 | 0.00 | | 0.00 |
| 2008 | 0.00 | | 0.00 |
| 2009 | 0.00 | | 0.00 |
| 2010 | 0.00 | | 0.00 |
| 2011 | 0.00 | | 0.00 |
| 2012 | 0.00 | | 0.00 |
| 2013 | 0.00 | | 0.00 |
| 2014 | 0.00 | | 0.00 |
| 2015 | 0.00 | | 0.00 |
| 2016 | 0.00 | | 0.00 |
| 2017 | 0.00 | | 0.00 |
| 2018 | 0.00 | | 0.00 |
| 2019 | 0.00 | | 0.00 |
| 2020 | 0.00 | | 0.00 |

| PLAINTIFF'S COSTS | | PRESENT VALUE |
| --- | --- | --- |
| YEAR | PEDIATRIC NEUROLOGIST | MICHIGAN 5% METHOD |
| 1991 | 270.00 | 270.00 |
| 1992 | 290.30 | 257.14 |
| 1993 | 312.13 | 245.45 |
| 1994 | 335.61 | 234.78 |
| 1995 | 360.85 | 225.00 |
| 1996 | 387.98 | 216.00 |
| 1997 | 417.16 | 207.69 |
| 1998 | 448.53 | 200.00 |
| 1999 | 318.29 | 127.29 |
| 2000 | 0.00 | 0.00 |
| 2001 | 0.00 | 0.00 |
| 2002 | 0.00 | 0.00 |
| 2003 | 0.00 | 0.00 |
| 2004 | 0.00 | 0.00 |
| 2005 | 0.00 | 0.00 |
| 2006 | 0.00 | 0.00 |
| 2007 | 0.00 | 0.00 |
| 2008 | 0.00 | 0.00 |
| 2009 | 0.00 | 0.00 |
| 2010 | 0.00 | 0.00 |
| 2011 | 0.00 | 0.00 |
| 2012 | 0.00 | 0.00 |
| 2013 | 0.00 | 0.00 |
| 2014 | 0.00 | 0.00 |
| 2015 | 0.00 | 0.00 |
| 2016 | 0.00 | 0.00 |
| 2017 | 0.00 | 0.00 |
| 2018 | 0.00 | 0.00 |
| 2019 | 0.00 | 0.00 |
| 2020 | 0.00 | 0.00 |

| PLAINTIFF'S COSTS | | PRESENT VALUE |
| --- | --- | --- |
| YEAR | INTERNIST | MICHIGAN 5% METHOD |
| 1991 | 0.00 | 0.00 |
| 1992 | 0.00 | 0.00 |
| 1993 | 0.00 | 0.00 |
| 1994 | 0.00 | 0.00 |
| 1995 | 0.00 | 0.00 |
| 1996 | 0.00 | 0.00 |
| 1997 | 0.00 | 0.00 |
| 1998 | 0.00 | 0.00 |
| 1999 | 277.21 | 110.86 |
| 2000 | 1,192.21 | 428.14 |
| 2001 | 1,281.87 | 413.87 |
| 2002 | 1,378.27 | 400.52 |
| 2003 | 1,481.91 | 388.00 |
| 2004 | 1,593.35 | 376.24 |
| 2005 | 1,713.17 | 365.18 |
| 2006 | 1,842.00 | 354.74 |
| 2007 | 1,980.52 | 344.89 |
| 2008 | 2,129.45 | 335.57 |
| 2009 | 2,289.59 | 326.74 |
| 2010 | 2,461.77 | 318.36 |

| PLAINTIFF'S COSTS | | PRESENT VALUE |
| --- | --- | --- |
| YEAR | INTERNIST | MICHIGAN 5% METHOD |
| 2011 | 2,646.89 | 310.40 |
| 2012 | 2,845.94 | 302.83 |
| 2013 | 3,059.95 | 295.62 |
| 2014 | 3,290.06 | 288.74 |
| 2015 | 3,537.47 | 282.18 |
| 2016 | 3,803.49 | 275.91 |
| 2017 | 4,089.51 | 269.91 |
| 2018 | 4,397.05 | 264.17 |
| 2019 | 4,727.70 | 258.67 |
| 2020 | 5,083.23 | 253.39 |

| PLAINTIFF'S COSTS | | PRESENT VALUE |
| --- | --- | --- |
| YEAR | NEUROLOGIST | MICHIGAN 5% METHOD |
| 1991 | 0.00 | 0.00 |
| 1992 | 0.00 | 0.00 |
| 1993 | 0.00 | 0.00 |
| 1994 | 0.00 | 0.00 |
| 1995 | 0.00 | 0.00 |
| 1996 | 0.00 | 0.00 |
| 1997 | 0.00 | 0.00 |
| 1998 | 0.00 | 0.00 |
| 1999 | 185.84 | 74.32 |
| 2000 | 599.44 | 215.27 |
| 2001 | 644.52 | 208.09 |
| 2002 | 692.99 | 201.38 |
| 2003 | 745.10 | 195.08 |
| 2004 | 801.13 | 189.17 |
| 2005 | 861.37 | 183.61 |
| 2006 | 926.15 | 178.36 |
| 2007 | 995.80 | 173.41 |
| 2008 | 1,070.68 | 168.72 |
| 2009 | 1,151.19 | 164.28 |
| 2010 | 1,237.76 | 160.07 |
| 2011 | 1,330.84 | 156.07 |
| 2012 | 1,430.92 | 152.26 |
| 2013 | 1,538.53 | 148.64 |
| 2014 | 1,654.23 | 145.18 |
| 2015 | 1,778.63 | 141.88 |
| 2016 | 1,912.38 | 138.73 |
| 2017 | 2,056.19 | 135.71 |
| 2018 | 2,210.81 | 132.82 |
| 2019 | 2,377.07 | 130.06 |
| 2020 | 2,555.82 | 127.40 |

| PLAINTIFF'S COSTS | | PRESENT VALUE |
| --- | --- | --- |
| YEAR | DIAPERS | MICHIGAN 5% METHOD |
| 1991 | 1,470.95 | 1,470.95 |
| 1992 | 1,549.50 | 1,400.90 |
| 1993 | 1,632.24 | 1,337.23 |
| 1994 | 1,719.40 | 1,279.09 |
| 1995 | 1,811.22 | 1,225.79 |

| PLAINTIFF'S COSTS | | PRESENT VALUE |
| YEAR | DIAPERS | MICHIGAN 5% METHOD |
| --- | --- | --- |
| 1996 | 1,907.94 | 1,176.76 |
| 1997 | 2,009.82 | 1,131.50 |
| 1998 | 2,117.15 | 1,089.59 |
| 1999 | 2,230.20 | 1,050.68 |
| 2000 | 2,349.30 | 1,014.45 |
| 2001 | 2,474.75 | 980.63 |
| 2002 | 2,606.90 | 949.00 |
| 2003 | 2,746.11 | 919.34 |
| 2004 | 2,892.75 | 891.48 |
| 2005 | 3,047.22 | 865.26 |
| 2006 | 3,209.95 | 840.54 |
| 2007 | 3,381.36 | 817.19 |
| 2008 | 3,561.92 | 795.11 |
| 2009 | 3,752.13 | 774.18 |
| 2010 | 3,952.49 | 754.33 |
| 2011 | 4,163.55 | 735.48 |
| 2012 | 4,385.89 | 717.54 |
| 2013 | 4,620.09 | 700.45 |
| 2014 | 4,866.81 | 684.16 |
| 2015 | 5,126.69 | 668.61 |
| 2016 | 5,400.46 | 653.76 |
| 2017 | 5,688.84 | 639.54 |
| 2018 | 5,992.63 | 625.94 |
| 2019 | 6,312.64 | 612.90 |
| 2020 | 6,649.73 | 600.39 |

| PLAINTIFF'S COSTS | | PRESENT VALUE |
| YEAR | WIPES | MICHIGAN 5% METHOD |
| --- | --- | --- |
| 1991 | 39.24 | 39.24 |
| 1992 | 41.34 | 37.37 |
| 1993 | 43.54 | 35.67 |
| 1994 | 45.87 | 34.12 |
| 1995 | 48.32 | 32.70 |
| 1996 | 50.90 | 31.39 |
| 1997 | 53.62 | 30.18 |
| 1998 | 56.48 | 29.07 |
| 1999 | 59.49 | 28.03 |
| 2000 | 62.67 | 27.06 |
| 2001 | 66.02 | 26.16 |
| 2002 | 69.54 | 25.32 |
| 2003 | 73.26 | 24.52 |
| 2004 | 77.17 | 23.78 |
| 2005 | 81.29 | 23.08 |
| 2006 | 85.63 | 22.42 |
| 2007 | 90.20 | 21.80 |
| 2008 | 95.02 | 21.21 |
| 2009 | 100.09 | 20.65 |
| 2010 | 105.44 | 20.12 |
| 2011 | 111.07 | 19.62 |
| 2012 | 117.00 | 19.14 |
| 2013 | 123.25 | 18.69 |
| 2014 | 129.83 | 18.25 |
| 2015 | 136.76 | 17.84 |
| 2016 | 144.07 | 17.44 |
| 2017 | 151.76 | 17.06 |

| PLAINTIFF'S COSTS | | PRESENT VALUE |
|---|---|---|
| YEAR | WIPES | MICHIGAN 5% METHOD |
| 2018 | 159.86 | 16.70 |
| 2019 | 168.40 | 16.35 |
| 2020 | 177.39 | 16.02 |

| PLAINTIFF'S COSTS | | PRESENT VALUE |
|---|---|---|
| YEAR | SHOES | MICHIGAN 5% METHOD |
| 1991 | 900.00 | 900.00 |
| 1992 | 948.06 | 857.14 |
| 1993 | 998.69 | 818.18 |
| 1994 | 1,052.02 | 782.61 |
| 1995 | 1,108.19 | 750.00 |
| 1996 | 1,167.37 | 720.00 |
| 1997 | 1,229.71 | 692.31 |
| 1998 | 1,295.38 | 666.67 |
| 1999 | 900.60 | 424.29 |
| 2000 | 0.00 | 0.00 |
| 2001 | 0.00 | 0.00 |
| 2002 | 0.00 | 0.00 |
| 2003 | 0.00 | 0.00 |
| 2004 | 0.00 | 0.00 |
| 2005 | 0.00 | 0.00 |
| 2006 | 0.00 | 0.00 |
| 2007 | 0.00 | 0.00 |
| 2008 | 0.00 | 0.00 |
| 2009 | 0.00 | 0.00 |
| 2010 | 0.00 | 0.00 |
| 2011 | 0.00 | 0.00 |
| 2012 | 0.00 | 0.00 |
| 2013 | 0.00 | 0.00 |
| 2014 | 0.00 | 0.00 |
| 2015 | 0.00 | 0.00 |
| 2016 | 0.00 | 0.00 |
| 2017 | 0.00 | 0.00 |
| 2018 | 0.00 | 0.00 |
| 2019 | 0.00 | 0.00 |
| 2020 | 0.00 | 0.00 |

| PLAINTIFF'S COSTS | | PRESENT VALUE |
|---|---|---|
| YEAR | LIFT & SCALES | MICHIGAN 5% METHOD |
| 1991 | 1,565.00 | 1,565.00 |
| 1992 | 0.00 | 0.00 |
| 1993 | 0.00 | 0.00 |
| 1994 | 0.00 | 0.00 |
| 1995 | 0.00 | 0.00 |
| 1996 | 0.00 | 0.00 |
| 1997 | 0.00 | 0.00 |
| 1998 | 0.00 | 0.00 |
| 1999 | 0.00 | 0.00 |
| 2000 | 0.00 | 0.00 |
| 2001 | 2,632.98 | 1,043.33 |
| 2002 | 0.00 | 0.00 |

| YEAR | PLAINTIFF'S COSTS<br>LIFT &<br>SCALES | PRESENT VALUE<br>MICHIGAN<br>5% METHOD |
|---|---|---|
| 2003 | 0.00 | 0.00 |
| 2004 | 0.00 | 0.00 |
| 2005 | 0.00 | 0.00 |
| 2006 | 0.00 | 0.00 |
| 2007 | 0.00 | 0.00 |
| 2008 | 0.00 | 0.00 |
| 2009 | 0.00 | 0.00 |
| 2010 | 0.00 | 0.00 |
| 2011 | 4,429.76 | 782.50 |
| 2012 | 0.00 | 0.00 |
| 2013 | 0.00 | 0.00 |
| 2014 | 0.00 | 0.00 |
| 2015 | 0.00 | 0.00 |
| 2016 | 0.00 | 0.00 |
| 2017 | 0.00 | 0.00 |
| 2018 | 0.00 | 0.00 |
| 2019 | 0.00 | 0.00 |
| 2020 | 0.00 | 0.00 |

| YEAR | PLAINTIFF'S COSTS<br>BATH<br>SUPPORTS | PRESENT VALUE<br>MICHIGAN<br>5% METHOD |
|---|---|---|
| 1991 | 244.65 | 244.65 |
| 1992 | 0.00 | 0.00 |
| 1993 | 0.00 | 0.00 |
| 1994 | 285.97 | 212.74 |
| 1995 | 0.00 | 0.00 |
| 1996 | 0.00 | 0.00 |
| 1997 | 334.28 | 188.19 |
| 1998 | 0.00 | 0.00 |
| 1999 | 0.00 | 0.00 |
| 2000 | 390.74 | 168.72 |
| 2001 | 0.00 | 0.00 |
| 2002 | 0.00 | 0.00 |
| 2003 | 456.74 | 152.91 |
| 2004 | 0.00 | 0.00 |
| 2005 | 0.00 | 0.00 |
| 2006 | 533.88 | 139.80 |
| 2007 | 0.00 | 0.00 |
| 2008 | 0:00 | 0.00 |
| 2009 | 624.06 | 128.76 |
| 2010 | 0.00 | 0.00 |
| 2011 | 0.00 | 0.00 |
| 2012 | 729.47 | 119.34 |
| 2013 | 0.00 | 0.00 |
| 2014 | 0.00 | 0.00 |
| 2015 | 852.68 | 111.20 |
| 2016 | 0.00 | 0.00 |
| 2017 | 0.00 | 0.00 |
| 2018 | 996.70 | 104.11 |
| 2019 | 0.00 | 0.00 |
| 2020 | 0.00 | 0.00 |

PLAINTIFF'S COSTS

PRESENT VALUE

| YEAR | LAB | MICHIGAN 5% METHOD |
|---|---|---|
| 1991 | 892.00 | 892.00 |
| 1992 | 926.70 | 849.52 |
| 1993 | 962.75 | 810.91 |
| 1994 | 1,000.20 | 775.65 |
| 1995 | 1,039.11 | 743.33 |
| 1996 | 1,079.53 | 713.60 |
| 1997 | 1,121.52 | 686.15 |
| 1998 | 1,165.15 | 660.74 |
| 1999 | 1,210.47 | 637.14 |
| 2000 | 1,257.56 | 615.17 |
| 2001 | 1,306.48 | 594.67 |
| 2002 | 1,357.30 | 575.48 |
| 2003 | 1,410.10 | 557.50 |
| 2004 | 1,464.95 | 540.61 |
| 2005 | 1,521.94 | 524.71 |
| 2006 | 1,581.14 | 509.71 |
| 2007 | 1,642.65 | 495.56 |
| 2008 | 1,706.55 | 482.16 |
| 2009 | 1,772.93 | 469.47 |
| 2010 | 1,841.90 | 457.44 |
| 2011 | 1,913.55 | 446.00 |
| 2012 | 1,987.99 | 435.12 |
| 2013 | 2,065.32 | 424.76 |
| 2014 | 2,145.66 | 414.88 |
| 2015 | 2,229.13 | 405.45 |
| 2016 | 2,315.84 | 396.44 |
| 2017 | 2,405.93 | 387.83 |
| 2018 | 2,499.52 | 379.57 |
| 2019 | 2,596.75 | 371.67 |
| 2020 | 2,697.76 | 364.08 |

PLAINTIFF'S COSTS

PRESENT VALUE

| YEAR | VAN | MICHIGAN 5% METHOD |
|---|---|---|
| 1991 | 35,104.21 | 35,104.21 |
| 1992 | 0.00 | 0.00 |
| 1993 | 0.00 | 0.00 |
| 1994 | 0.00 | 0.00 |
| 1995 | 0.00 | 0.00 |
| 1996 | 0.00 | 0.00 |
| 1997 | 0.00 | 0.00 |
| 1998 | 45,958.96 | 26,003.12 |
| 1999 | 0.00 | 0.00 |
| 2000 | 0.00 | 0.00 |
| 2001 | 0.00 | 0.00 |
| 2002 | 0.00 | 0.00 |
| 2003 | 0.00 | 0.00 |
| 2004 | 0.00 | 0.00 |
| 2005 | 60,170.16 | 20,649.54 |
| 2006 | 0.00 | 0.00 |
| 2007 | 0.00 | 0.00 |
| 2008 | 0.00 | 0.00 |
| 2009 | 0.00 | 0.00 |
| 2010 | 0.00 | 0.00 |

| PLAINTIFF'S COSTS | | PRESENT VALUE |
| --- | --- | --- |
| YEAR | VAN | MICHIGAN<br>5% METHOD |
| 2011 | 0.00 | 0.00 |
| 2012 | 78,775.68 | 17,124.00 |
| 2013 | 0.00 | 0.00 |
| 2014 | 0.00 | 0.00 |
| 2015 | 0.00 | 0.00 |
| 2016 | 0.00 | 0.00 |
| 2017 | 0.00 | 0.00 |
| 2018 | 0.00 | 0.00 |
| 2019 | 103,134.30 | 14,626.75 |
| 2020 | 0.00 | 0.00 |

| PLAINTIFF'S COSTS | | PRESENT VALUE |
| --- | --- | --- |
| YEAR | INSURANCE | MICHIGAN<br>5% METHOD |
| 1991 | 698.00 | 698.00 |
| 1992 | 750.71 | 664.76 |
| 1993 | 807.39 | 634.55 |
| 1994 | 868.36 | 606.96 |
| 1995 | 933.93 | 581.67 |
| 1996 | 1,004.45 | 558.40 |
| 1997 | 1,080.29 | 536.92 |
| 1998 | 1,161.87 | 517.04 |
| 1999 | 1,249.60 | 498.57 |
| 2000 | 1,343.96 | 481.38 |
| 2001 | 1,445.44 | 465.33 |
| 2002 | 1,554.58 | 450.32 |
| 2003 | 1,671.97 | 436.25 |
| 2004 | 1,798.22 | 423.03 |
| 2005 | 1,934.01 | 410.59 |
| 2006 | 2,080.04 | 398.86 |
| 2007 | 2,237.11 | 387.78 |
| 2008 | 2,406.03 | 377.30 |
| 2009 | 2,587.71 | 367.37 |
| 2010 | 2,783.11 | 357.95 |
| 2011 | 2,993.26 | 349.00 |
| 2012 | 3,219.28 | 340.49 |
| 2013 | 3,462.37 | 332.38 |
| 2014 | 3,723.81 | 324.65 |
| 2015 | 4,005.00 | 317.27 |
| 2016 | 4,307.42 | 310.22 |
| 2017 | 4,632.67 | 303.48 |
| 2018 | 4,982.48 | 297.02 |
| 2019 | 5,358.71 | 290.83 |
| 2020 | 5,763.34 | 284.90 |

| PLAINTIFF'S COSTS | | PRESENT VALUE |
| --- | --- | --- |
| YEAR | EQUIPMENT | MICHIGAN<br>5% METHOD |
| 1991 | 1,500.00 | 1,500.00 |
| 1992 | 200.00 | 180.82 |
| 1993 | 200.00 | 163.85 |
| 1994 | 1,580.10 | 1,175.46 |
| 1995 | 158.01 | 106.94 |

**810**

PLAINTIFF'S COSTS

PRESENT VALUE

| YEAR | EQUIPMENT | MICHIGAN 5% METHOD |
|---|---|---|
| 1996 | 166.45 | 102.66 |
| 1997 | 175.34 | 98.71 |
| 1998 | 184.70 | 95.06 |
| 1999 | 194.56 | 91.66 |
| 2000 | 2,395.69 | 1,034.48 |
| 2001 | 239.57 | 94.93 |
| 2002 | 252.36 | 91.87 |
| 2003 | 265.84 | 89.00 |
| 2004 | 280.03 | 86.30 |
| 2005 | 294.99 | 83.76 |
| 2006 | 3,273.34 | 857.14 |
| 2007 | 327.33 | 79.11 |
| 2008 | 344.81 | 76.97 |
| 2009 | 363.23 | 74.95 |
| 2010 | 382.62 | 73.02 |
| 2011 | 403.06 | 71.20 |
| 2012 | 4,472.51 | 731.71 |
| 2013 | 447.25 | 67.81 |
| 2014 | 471.13 | 66.23 |
| 2015 | 496.29 | 64.73 |
| 2016 | 522.79 | 63.29 |
| 2017 | 550.71 | 61.91 |
| 2018 | 6,110.98 | 638.30 |
| 2019 | 611.10 | 59.33 |
| 2020 | 643.73 | 58.12 |

PLAINTIFF'S COSTS

PRESENT VALUE

| YEAR | AUGMENTATIVE COMMUNICATION | MICHIGAN 5% METHOD |
|---|---|---|
| 1991 | 0.00 | 0.00 |
| 1992 | 0.00 | 0.00 |
| 1993 | 0.00 | 0.00 |
| 1994 | 0.00 | 0.00 |
| 1995 | 0.00 | 0.00 |
| 1996 | 0.00 | 0.00 |
| 1997 | 0.00 | 0.00 |
| 1998 | 0.00 | 0.00 |
| 1999 | 0.00 | 0.00 |
| 2000 | 0.00 | 0.00 |
| 2001 | 0.00 | 0.00 |
| 2002 | 0.00 | 0.00 |
| 2003 | 0.00 | 0.00 |
| 2004 | 0.00 | 0.00 |
| 2005 | 0.00 | 0.00 |
| 2006 | 0.00 | 0.00 |
| 2007 | 6,997.83 | 2,111.11 |
| 2008 | 7,270.05 | 2,054.05 |
| 2009 | 7,552.85 | 2,000.00 |
| 2010 | 7,846.66 | 1,948.72 |
| 2011 | 8,151.89 | 1,900.00 |
| 2012 | 8,469.00 | 1,853.66 |
| 2013 | 8,798.45 | 1,809.52 |
| 2014 | 9,140.71 | 1,767.44 |
| 2015 | 9,496.28 | 1,727.27 |
| 2016 | 9,865.69 | 1,688.89 |
| 2017 | 10,249.46 | 1,652.17 |

| PLAINTIFF'S COSTS | | PRESENT VALUE |
| YEAR | AUGMENTATIVE COMMUNICATION | MICHIGAN 5% METHOD |
| --- | --- | --- |
| 2018 | 10,648.16 | 1,617.02 |
| 2019 | 11,062.38 | 1,583.33 |
| 2020 | 11,492.70 | 1,551.02 |

| PLAINTIFF'S COSTS | | PRESENT VALUE |
| YEAR | HOUSE- BEDROOM/BATH | MICHIGAN 5% METHOD |
| --- | --- | --- |
| 1991 | 17,475.00 | 17,475.00 |
| 1992 | 0.00 | 0.00 |
| 1993 | 0.00 | 0.00 |
| 1994 | 0.00 | 0.00 |
| 1995 | 0.00 | 0.00 |
| 1996 | 0.00 | 0.00 |
| 1997 | 0.00 | 0.00 |
| 1998 | 0.00 | 0.00 |
| 1999 | 0.00 | 0.00 |
| 2000 | 0.00 | 0.00 |
| 2001 | 0.00 | 0.00 |
| 2002 | 0.00 | 0.00 |
| 2003 | 0.00 | 0.00 |
| 2004 | 0.00 | 0.00 |
| 2005 | 0.00 | 0.00 |
| 2006 | 0.00 | 0.00 |
| 2007 | 0.00 | 0.00 |
| 2008 | 0.00 | 0.00 |
| 2009 | 0.00 | 0.00 |
| 2010 | 0.00 | 0.00 |
| 2011 | 0.00 | 0.00 |
| 2012 | 0.00 | 0.00 |
| 2013 | 0.00 | 0.00 |
| 2014 | 0.00 | 0.00 |
| 2015 | 0.00 | 0.00 |
| 2016 | 0.00 | 0.00 |
| 2017 | 0.00 | 0.00 |
| 2018 | 0.00 | 0.00 |
| 2019 | 0.00 | 0.00 |
| 2020 | 0.00 | 0.00 |

Loss of Earnings and Earning Capacity

| Year | Lost Earnings Reduced to Present Value |
| --- | --- |
| 1991–2008 | 0 |
| 2009 | $18,664.67 |
| 2010 | $18,664.67 |
| 2011 | $18,664.67 |
| 2012 | $18,664.67 |
| 2013 | $18,664.67 |
| 2014 | $18,664.67 |
| 2015 | $18,664.67 |
| 2016 | $18,664.67 |
| 2017 | $18,664.67 |
| 2018 | $18,664.67 |
| 2019 | $18,664.67 |

| Year | Lost Earnings Reduced to Present Value |
|------|----------------------------------------|
| 2020 | $18,664.67 |

Non–Economic Damages

| Year | Non-economic Damages |
|------|----------------------|
| 1986 | $57,142.80 |
| 1987 | $57,142.80 |
| 1988 | $57,142.80 |
| 1989 | $57,142.80 |
| 1990 | $57,142.80 |
| 1991 | $54,421.78 |
| 1992 | $51,948.06 |
| 1993 | $49,689.45 |
| 1994 | $47,619.06 |
| 1995 | $45,714.30 |
| 1996 | $43,956.05 |
| 1997 | $42,328.05 |
| 1998 | $40,816.34 |
| 1999 | $39,408.88 |
| 2000 | $38,095.25 |
| 2001 | $36,866.37 |
| 2002 | $35,714.29 |
| 2003 | $34,632.04 |
| 2004 | $33,613.45 |
| 2005 | $32,653.07 |
| 2006 | $31,746.04 |
| 2007 | $30,888.04 |
| 2008 | $30,075.19 |
| 2009 | $29,304.04 |
| 2010 | $28,571.44 |
| 2011 | $27,874.57 |
| 2012 | $27,210.89 |
| 2013 | $26,578.08 |
| 2014 | $25,974.03 |
| 2015 | $25,396.83 |
| 2016 | $24,844.73 |
| 2017 | $24,316.11 |
| 2018 | $23,809.53 |
| 2019 | $23,323.62 |
| 2020 | $22,857.15 |